SETTY GUNDANNA AND PRABHAVATHI KATTA VIRALAM, PETITIONERS *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 21355–03.        Filed February 14, 2011.

In 1998 P–H transferred stocks and cash to X, an organization described in I.R.C. sec. 501(c) that was not a private foundation. X sent P–H acknowledgment letters for the stock transfers which stated that no goods or services were provided for the "donation" of the stocks. X sold the stocks in 1998. X maintained a segregated account for P–H in its records, reflecting the stocks and cash received, the proceeds from the sales of the stocks and their reinvestment, the dividends and interest generated by the assets in the account, and the disbursements from the account in subsequent years. Promotional materials provided to P–H by X represented that P–H would be able to direct the distribution of the funds in the account for purported charitable purposes, including student loans and as compensation for the performance of charitable services by P–H or members of his family. P–H anticipated at the time of the transfers of the stocks to X that account funds could be used for student loans to his children. Ps claimed a charitable contribution deduction on their 1998 Federal income tax return equal to the fair market value of the stocks and the cash transferred to X. In 2001 and 2002 X transferred at P–H's request a total of $70,299 from the account to an educational institution in payment of the college tuition and related expenses of P–H's son. P–H's son executed loan documents that obligated him to repay the amounts transferred, plus interest, in cash or by providing designated amounts of charitable services. R issued a notice of deficiency for 1998 disallowing the charitable contribution deduction claimed, requiring the inclusion in Ps' gross income of capital gains realized upon the sales of the stocks by X in 1998 after the transfers as well as the dividends and interest generated by the account assets in 1998, and determining a penalty under I.R.C. sec. 6662(a) and (b)(1) and (2). *Held*: P–H retained dominion and control over the property transferred to X. Accordingly, Ps are not entitled to any charitable contribution deduction on account of the transfers and must include in

151

gross income the capital gains realized upon X's sales of the transferred stocks as well as the dividends and interest generated by the assets in the segregated account. *Held*, *alternatively*, Ps are not entitled to any charitable contribution deduction for failure to comply with the substantiation requirements of I.R.C. sec. 170(f)(8). *Held*, *further*, Ps are liable for a penalty under I.R.C. sec. 6662(a) and (b)(1) or (2).

*Michael C. Durney*, for petitioners.

*Thomas A. Dombrowski* and *Mark A. Weiner*, for respondent.

GALE, *Judge*: Respondent determined a deficiency of $91,948 and an accuracy-related penalty of $18,389 with respect to petitioners' 1998 Federal income tax.

The issues for decision are: (1) Whether petitioners are entitled to a charitable contribution deduction under section 170[1] of $263,933 for purported transfers of appreciated stocks and cash to the xélan Foundation; (2) whether petitioners must include in gross income $93,324 of capital gain resulting from the sales of the appreciated stocks by the xélan Foundation in 1998 and $981 of interest and dividend income generated in 1998 by property purportedly transferred by petitioners to the xélan Foundation; and (3) whether petitioners are liable for an accuracy-related penalty under section 6662.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time the petition was filed, petitioners resided in Florida.

*xélan*

Petitioners are both medical doctors. Petitioner Setty Gundanna Viralam (petitioner) owned a 50-percent interest in a medical practice, which he sold in 1998 for $2,262,500, generating a taxable gain of $2,261,750 in that year. In late 1997, when negotiating the sale of his medical practice, petitioner learned of xélan,[2] a financial planning company for

---

[1] Unless otherwise noted, all section references are to the Internal Revenue Code of 1986, as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded to the nearest dollar.

[2] According to a xélan publication, the name xélan "[combines] 'x', the individual's savings re-

doctors. Petitioner attended a presentation promoting the financial planning programs of xélan and became a member in November 1997.

xélan, also known as the Economic Association of Health Professionals, Inc., was a membership organization for doctors during the years relevant to this case. It provided member doctors with financial planning services, including pension plans, insurance products, tax reduction and asset protection strategies, and investment management. These financial services were provided through a network of xélan financial counselors.

Payment of a $975 membership fee entitled a xélan member to the "xélan Tax Reduction Plan", including a questionnaire on which he or she provided personal financial information from which xélan made financial planning recommendations. Members were also provided various promotional materials, including a Program Summary describing xélan programs and services, and the xélan Doctors Financial Education Program (Financial Education Program), which provided similar material in video and audio tape formats. [3] After joining xélan, petitioners received copies of the xélan Tax Reduction Plan and the Financial Education Program in December 1997 and, at some time before engaging in the transfers at issue, a copy of the Program Summary. Petitioner was familiar with these materials.

*xélan Foundation*

One of the financial planning strategies summarized in the xélan promotional materials was establishment through donations to the xélan Foundation (Foundation) of an account that the materials characterized as a "donor advised fund" or "family public charity" (Foundation account), by means of which a donor's donations would be segregated for

quired to finance lifestyle costs through life expectancy, with 'élan', the French word meaning a lifestyle of personal freedom."

  [3] Petitioners objected, on the grounds of relevance, duplication, and, in one instance, lack of foundation, to the admission of most of xélan's promotional materials and to materials from the files of Rick Jaye, the xélan financial counselor assigned to petitioners. We overrule petitioners' objections. The evidence is relevant because the promotional materials of xélan and the xélan Foundation bear upon petitioner's intent and understanding when he transferred appreciated stocks to the xélan Foundation. The disputed exhibits are not unduly duplicative, as there are variations in the material that help to establish the chronology of events. As the evidence establishes that Mr. Jaye was petitioners' financial counselor at xélan, the materials that are stipulated to be from his files do not lack foundational evidence.

investment and future distribution as the donor might recommend. [4] A xélan financial counselor recommended, on the basis of the personal financial information petitioners provided, that petitioner establish a Foundation account.

For the periods relevant to this case, the Foundation was recognized by the Commissioner as an organization described in section 501(c)(3), having received a determination letter to that effect on March 20, 1998 (determination letter). The Foundation was listed as a public charity in Publication 78, Cumulative List of Organizations described in Section 170(c) of the Internal Revenue Code of 1986, published in January 1999. [5] The Commissioner issued a determination in 2002 that the Foundation was not a private foundation within the meaning of section 509.

The promotional materials characterized Foundation accounts as a "tax reduction" program and stated that the Foundation "was created to benefit not only charitable causes, but also doctors and their families." The Program Summary describes the Foundation as follows:

The xélan Foundation is a public charity that enables doctors to contribute pre-tax earnings to their own family public charities that are subaccounts of the "umbrella" xélan Foundation charity. * * * Growth on contributions within the Family Public Charity accounts accrue [sic] tax deferred. Doctor donors may direct the use of funds accumulated within their family public charity accounts to finance charitable projects including personal teaching, research, pro bono works, [and] college and graduate scholarship programs * * * .

Donors and their family members may work for and be compensated by their family public charities for good works (teaching, research, or providing pro bono services) they perform on behalf of their family public charities. * * *

---

[4] The xélan materials variously characterized a potential Foundation donor's segregated account to be maintained at the Foundation as a "family public charity", a "sub-foundation of the umbrella xélan Foundation", or a "donor advised fund". We shall refer to the account maintained by the Foundation segregating property petitioner transferred to it, and the income generated by and disbursements from those segregated assets, as petitioner's Foundation account.

Any reference to a donor advised fund herein does not denote the term as defined in sec. 4966, which establishes a definition of, and certain rules applicable to, a "donor advised fund", effective for periods after those at issue. See Pension Protection Act of 2006 (PPA), Pub. L. 109–280, sec. 1231(a), 120 Stat. 1094. Likewise, secs. 170(f)(18) and 2522(c)(5), establishing certain restrictions on deductions of charitable contributions to donor advised funds (as defined in sec. 4966) are effective for periods after those at issue. See PPA sec. 1234, 120 Stat. 1100.

[5] The Foundation continued to be listed in Publication 78 at the time of trial. However, the Commissioner issued an examination report in 2004 proposing revocation of the Foundation's exempt status, and that status was revoked on Sept. 13, 2010. Announcement 2010–55, 2010–37 I.R.B. 346.

The Financial Education Program also explained with reference to Foundation accounts that

Your family then is the advisor to that fund as to the way the money is invested. And the growth on the invested money accrues tax deferred. Anytime you want to you could take the money out of your family public charity and pay yourself compensation to do good works.

The Foundation also offered Foundation account holders a student loan program whereby Foundation account funds could be disbursed as loans for college and graduate school tuition and related expenses. The program's terms further provided that the loans could be repaid (with interest) either through repayments generally commencing 5 years after graduation or by the recipient's providing charitable services for designated periods. A xélan financial counselor wrote petitioner in April 1998 recommending that he "Establish a Foundation account for charitable giving, income tax reduction planning, estate tax reduction, *educational funding*, and future retirement planning." (Emphasis added.)

Petitioners had three children, and petitioner advised Foundation personnel in the questionnaire he completed in late 1997 that he anticipated paying for 8 years of college and g for each of his children, at a cost of approximately $40,000 annually for each. Petitioner was interested in the Foundation's student loan program; he understood that his own children would be able to benefit from the student loan program if he established a Foundation account and he intended to use the account for that purpose.

*Petitioner's Establishment of Foundation Account*

Following the xélan financial counselor's recommendation, petitioner took the initial steps to establish a Foundation account in April 1998. Using funds already on deposit with xélan, petitioner paid a $1,400 setup fee to establish a Foundation account and made a $100 initial contribution to the account.

On May 12, 1998, petitioner submitted an "Application To Establish a Donor Advised Fund" to the Foundation, designating himself as the "fund advisor". Petitioner signed the application under a provision labeled "Fund Advisor Statement", which stated:

I certify that I understand the nature of donor advised funds and will conduct activities which satisfy the requirements of the Internal Revenue Code. I understand that in order to qualify as a deductible contribution for income tax purposes, the ownership and custody of my donated funds and property will be fully relinquished to the xélan Foundation.

The application allowed petitioner to choose among 12 investment strategies for managing the assets contributed to his Foundation account. Petitioner chose a strategy directed at aggressive growth. [6]

Petitioner received and reviewed a brochure describing the features of the Foundation program entitled "A New Approach to Charitable Giving *and* Savings". The brochure stated, in response to the question "When can I start drawing monies out?", that a doctor could do so when he began performing community service work and that, to comply with the tax code, a formal request was required to be submitted to and approved by the Foundation's board of directors.

The brochure further warranted that "the xélan Foundation will not initiate charitable distributions from your fund, unless it is left with no advisor."

After establishing his Foundation account, petitioner received a letter from the law firm of Conner & Winters, legal counsel to the Foundation. The letter expressed an opinion that it was more likely than not that a contributor would be entitled to a deduction for a charitable contribution to the Foundation. The letter represented that the opinion expressed therein was based on an examination of the Foundation's certificate of incorporation, its bylaws, resolutions of its board of directors, and representations made to the Commissioner of Internal Revenue in connection with the Foundation's application for recognition of section 501(c)(3) tax-exempt status. However, the letter stated that Conner & Winters had not examined any documents pertaining to, and would not render an opinion as to the tax effect of, any of several programs of the Foundation, including "donor advised distributions", "educational loans", and "charitable service [performed by a donor] for the Foundation". The letter expressly disclaimed any opinion on the tax effect of "any

---

[6] The application also had a section entitled "Proposed Charitable Purpose" wherein the applicant was requested to check off certain charitable purposes or to describe his charitable objectives. Petitioner left this section blank.

specific charitable or other activity of the Foundation or any donor with respect to the Foundation". No attorney at Conner & Winters had any contact with petitioners at any time before the opinion letter was sent. Conner & Winters sent similar letters to other doctors who established Foundation accounts.

Petitioner also received a letter from xélan's chairman on May 26, 1998, thanking him for his participation in the Foundation program. Enclosed with this letter were sample student loan program participation forms and a sample distribution request form.

Upon establishing his Foundation account, petitioner made several transfers of stocks to the Foundation. The transfers are summarized as follows.

| Date of transfer | Stock | Value [1] |
|---|---|---|
| Aug. 25, 1998 | Republic Security Financial | $85,000 |
| Aug. 25, 1998 | Professionals Group, Inc. | 51,317 |
| Nov. 20–25, 1998 | Various [2] | 121,536 |
| Dec. 28, 1998 | Citrix Systems, Inc. | 4,580 |
| Total | | 262,433 |

[1] Fair market value as of the date of transfer.
[2] The stocks transferred on Nov. 20–25, 1998, consisted of shares of 25 companies.

The transferred stocks were recorded in the Foundation's records in a subaccount denominated the Viralam Family Charitable Trust (referred to herein as petitioner's Foundation account).

After each of the transfers summarized above, petitioner received an acknowledgment letter from the Foundation that was labeled "Receipt for Gift of Stock". These acknowledgment letters described the stock transferred and its fair market value on the date of the transfer. Each letter also contained the following statement: "No goods or services were provided for this donation."

Petitioner's aggregate basis in the transferred stocks was $131,360. The Foundation subsequently sold all of the stocks during 1998 and invested the proceeds, again segregating them in the Foundation's records as petitioner's Foundation account. The sales of the stocks yielded the following proceeds:

| Date of sale | Stock | Net proceeds |
|---|---|---|
| Sept. 28, 1998 | Republic Security Financial | $73,795 |
| Sept. 28, 1998 | Professionals Group, Inc. | 40,151 |
| Dec. 3, 1998 | Various | 106,203 |
| Dec. 30, 1998 | Citrix Systems, Inc. | 4,535 |
| Total | | 224,684 |

The assets in petitioner's Foundation account generated $981 in dividends and interest in 1998.

The Foundation sent petitioner a monthly accounting of his Foundation account. Between May 18, 1998, and February 1, 2005, $29,383 was deducted from petitioner's Foundation account for management and administration fees, consisting of a one-time fee equal to 6 percent of the value of the stock petitioner transferred to the account and an annual investment fee of 1 percent of the account's value.[7]

### Charitable Contribution Deduction for Stock Transfers to Foundation

Petitioners timely filed a joint Federal income tax return for 1998. In addition to reporting a $2,261,750 gain from the sale of petitioner's medical practice, they claimed a charitable contribution deduction of $263,933, equal to the fair market value of the stocks transferred to the xélan Foundation in 1998 ($262,433), plus the $1,400 setup fee paid to the Foundation and the initial $100 in cash deposited into petitioner's Foundation account in that year. Petitioners' 1998 return was prepared by petitioners' accountant, who had been providing accounting services to petitioners since 1984. Petitioner discussed the charitable contribution deduction with the accountant before petitioners signed the return. Petitioners did not include in income on the 1998 return any gain from the sales of the stocks that had been transferred to the Foundation, and the Foundation had sold, in 1998 nor any dividends or interest generated by the assets in petitioner's Foundation account during that year.

---

[7] The parties have stipulated that the annual investment fee was 1 percent, whereas the Foundation brochure in evidence refers to the fee as 1.1 percent. We consider the discrepancy immaterial for purposes of deciding the case.

*Distributions From Petitioner's Foundation Account in Subsequent Years*

In accordance with petitioner's requests, the Foundation made distributions from his Foundation account of $4,000, $1,000, $5,000, and $4,000 to the Shiva Vishnu Temple in 1999, 2000, 2001, and 2002, respectively, and distributions of $1,000 and $500 to the Sarada Foundation in 2002 and 2003, respectively. [8]

Also in 2001 petitioner requested that $17,247 be distributed from his Foundation account to the University of Pennsylvania in connection with the Foundation's student loan program, as a loan to his son Vinay to cover the cost of Vinay's tuition and room and board at that institution. The distribution was made pursuant to a "distribution request" form the Foundation sent to petitioner on April 25, 2001. As sent to petitioner, the form was dated July 9, 2001, and partially completed. Filled out were entries for the "amount of distribution": "$17,247"; "name of charity": "University of Pennsylvania"; and the "purpose of distribution": "Student Loan for Vinay S. Viralam". The form had been signed as approved by a Foundation official and was forwarded to petitioner for his signature, with instructions that it be returned to the Foundation with certain loan documents to be executed by Vinay, as described below.

On July 6, 2001, Vinay executed documents with respect to the $17,247 loan for his tuition and expenses at the University of Pennsylvania. The documents included a "Commitment Agreement" (commitment agreement) and an "Education Expense Repayment Agreement" (repayment agreement).

In the commitment agreement Vinay agreed to participate in the Foundation's "Educational Funding Program" and, in return for receiving educational loans from the Foundation, to provide 2,000 hours of charitable work for the Foundation for each year of educational expenses advanced. The commitment agreement stated that if Vinay did not undertake sufficient charitable work to repay the educational expenses advanced, he would repay the Foundation all edu-

---

[8] Petitioners claimed charitable contribution deductions for the distributions made by petitioner's Foundation account to Shiva Vishnu Temple in 1999 and 2000 on their Federal income tax returns for those years but now concede that those deductions were improper.

cational expenses advanced that were not reduced by charitable services, together with interest according to the terms of the repayment agreement. Finally, the commitment agreement stated that "the student will provide regular reports, at least annually, of his or her progress in the course of study and intended work, as well as, his or her plan to meet the obligations of the Agreement."

The repayment agreement acknowledged cash advances on Vinay's behalf by the Foundation to the University of Pennsylvania for tuition, fees, and on-campus room and board for the period beginning August 2001. The repayment agreement provided that Vinay would repay to the Foundation the sums advanced plus annual interest equal to specified Federal long-term rates commencing on the date of the agreement. Under the agreement, the obligation to repay principal and interest could be satisfied either by Vinay's performance of charitable services at the rate of 2,000 hours of service for each full year of education expenses advanced, or by actual payment of principal and accrued interest. No payments were due until 5 years after Vinay's "originally scheduled graduation date". At that time, any balance not satisfied through the charitable services option was required to be repaid over a 15-year term.

Sometime shortly after July 6, 2001, petitioner submitted the completed distribution request form and loan documents, and on July 25, 2001, the Foundation made a distribution of $17,247 to the University of Pennsylvania for tuition, fees, and room and board for Vinay.

Also in July 2001, respondent commenced an examination of petitioners' 1998 return. On May 20, 2002, respondent sent petitioners a 30-day letter, proposing a disallowance of the charitable contribution deduction claimed for petitioner's transfers of appreciated stocks to the Foundation and an increase in petitioners' capital gains income (reflecting an attribution to them of the proceeds of the sales of stocks in 1998 after their transfer to the Foundation).

Petitioner submitted four additional distribution requests in 2002 that resulted in transfers by the Foundation to the University of Pennsylvania for Vinay's tuition, fees, and room and board (to be treated as loans to Vinay) of $6,769, $13,073, $14,385, and $18,825, on January 28, May 20, July 24, and December 26, 2002, respectively. The distributions

petitioner requested from his Foundation account in 2001 and 2002 for Vinay's University of Pennsylvania expenses totaled $70,299.

On June 15, 2003, $19,499, or 10 percent of petitioner's Foundation account balance, was withdrawn for "legal fees". xélan paid the fees for petitioners' legal representation during the examination of their 1998 return and the fees for petitioners' counsel in this proceeding.

On September 16, 2003, respondent issued petitioners a notice of deficiency for 1998 disallowing their claimed charitable contribution deduction for the transfers of stocks (and cash [9]) to the Foundation and determining an accuracy-related penalty. Eleven days earlier, petitioner arranged for an entity he and Vinay controlled to pay the Foundation $70,300, the total of the distributions to the University of Pennsylvania on Vinay's behalf from petitioner's Foundation account. [10] This payment was credited to petitioner's Foundation account. The Foundation thereupon waived all interest that had accrued under the terms of the repayment agreement and returned the commitment agreement and repayment agreement to Vinay marked "paid in full", along with a letter confirming that the $70,300 payment had fulfilled Vinay's obligation to the Foundation.

## OPINION

### Burden of Proof

Petitioners argue that respondent bears the burden of proof in this proceeding pursuant to section 7491(a). However, the burden of proof has no practical consequence in this case, as there is no evidentiary tie. Our findings with respect to all factual issues are based upon a preponderance of the evidence. See *Blodgett v. Commissioner*, 394 F.3d 1030, 1039 (8th Cir. 2005), affg. T.C. Memo. 2003–212; *Knudsen v. Commissioner*, 131 T.C. 185, 188–189 (2008); see also *Geiger*

---

[9] The disputed charitable contribution deduction reflects 1998 transfers of stocks with a fair market value of $262,433, plus a $1,400 setup fee, and $100 in cash. The parties have not advanced any arguments for separate treatment of the setup fee, and we consequently do not distinguish it in our analysis.

[10] We assume the $1 discrepancy between the $70,300 payment petitioner made to the Foundation in 2003 and the $70,299 figure reached by totaling the distributions the Foundation made to the University of Pennsylvania in 2001 and 2002 reflects rounding.

*v. Commissioner*, 279 Fed. Appx. 834, 835 (11th Cir. 2008), affg. T.C. Memo. 2006–271.

*Charitable Contribution Deduction*

Section 170(a)(1) allows a deduction for any charitable contribution, payment of which is made during the taxable year. Section 170(c)(2) defines a "charitable contribution" for this purpose to include a contribution or gift to or for the use of a foundation organized and operated exclusively for charitable or educational purposes. [11]

In order for a transfer of property to a charitable organization to qualify for a charitable contribution deduction, (1) the transfer must be a completed gift; that is, the donor must have relinquished dominion and control over the donated property, *Pollard v. Commissioner*, 786 F.2d 1063, 1067 (11th Cir. 1986), affg. T.C. Memo. 1984–536; (2) the contribution must have been made with donative intent and without the expectation of a substantial benefit in return, *United States v. Am. Bar Endowment*, 477 U.S. 105, 118 (1986); and (3) a contribution of $250 or more must be substantiated by a contemporaneous written acknowledgment of the contribution by the donee organization that meets the requirements of section 170(f)(8)(B), sec. 170(f)(8).

Respondent contends that petitioners are not entitled to a charitable contribution deduction for the stock transfers to the Foundation because petitioners never surrendered dominion and control over the property or, alternatively, because petitioners failed to substantiate the deduction as required by section 170(f)(8), the Foundation's acknowledgment of the contribution having failed to describe or value the goods or services that petitioner expected to receive in consideration of the contribution. Petitioners contend that they relinquished to the Foundation all control over the transferred property, citing petitioner's certification to that effect in the Fund Advisor Statement he executed in connection with establishing his Foundation account. Petitioners further contend that petitioner's Foundation account satisfied the requirements for a donor advised fund as set out in *Natl. Found., Inc. v. United States*, 13 Cl. Ct. 486 (1987). They

---

[11] As reflected in our findings, the parties have stipulated that the Foundation was a tax-exempt organization described in sec. 501(c)(3) during the periods relevant to this case.

maintain that, consistent with the holding in that case, petitioner could only suggest that the Foundation make designated charitable contributions from his Foundation account and suggest an investment strategy for the assets in the account and that these factors are insufficient to establish that petitioner retained control over the property transferred to the Foundation. Finally, petitioners contend that they did not receive any substantial benefit in return for petitioner's contribution to the Foundation and properly substantiated the charitable contribution deduction claimed.

We agree with respondent that petitioner retained dominion and control over the property transferred to the Foundation and held in his Foundation account. We reach this conclusion principally on the basis of the use of funds in petitioner's Foundation account for student loans to his son. We also find that the promotion of another Foundation account feature—petitioner's ability to arrange for distributions of account funds to compensate himself or family members for performance of "good works"—also supports the conclusion that petitioner maintained control of the assets in his Foundation account.

Petitioner received the xélan promotional materials and was familiar with their contents. The materials petitioner reviewed identified certain scholarship programs as one of the undertakings to which a donor could direct funds in his Foundation account. [12] Petitioner was aware of a Foundation program under which student loans could be made from Foundation accounts. The Foundation account arrangements allowed a donor to designate a "fund advisor" to "advise" the Foundation regarding distributions from the donor's account, and petitioner designated himself as fund advisor to his account. A Foundation brochure stated that the Foundation would not initiate charitable distributions from an individual donor's account unless there was no fund advisor in place. Petitioner testified that he understood when deciding to establish a Foundation account that the Foundation's student loan program would be available for his children's use and that he was contemplating using the student loan program

---

[12] The Program Summary petitioner reviewed stated that donors to the Foundation with Foundation accounts "may direct the use of funds accumulated within their family public charity accounts to finance charitable projects including * * * college and graduate scholarship programs."

for his children. The significance of the student loan program in petitioner's decision to make transfers to his Foundation account is corroborated by the fact that a sample student loan participation form was included with the first letter sent to petitioner (by xélan's chairman) acknowledging petitioner's establishment of a Foundation account.

When he established his Foundation account in 1998, petitioner anticipated that each of his three children would incur 8 years of college and graduate school expenses which he estimated would approximate $40,000 annually per child. The distributions from petitioner's Foundation account for student loans for his oldest son dwarfed the distributions for other purposes for the first 5 years, until respondent commenced an examination of petitioners' 1998 return and proposed to disallow their deduction for the contributions to the Foundation. Disregarding payment of the Foundation's startup and annual management fees, the distributions made from petitioner's Foundation account in 1999 through 2003 for purposes other than Vinay's student loans totaled $15,500. [13] The distributions for Vinay's student loans during that period totaled $70,299, or approximately 82 percent of distributions not devoted to management fees. Respondent first proposed to disallow petitioners' charitable contribution deduction for the Foundation transfer in a 30-day letter issued in May 2002 and formally did so in a notice of deficiency issued on September 16, 2003. No distributions for student loans were made from petitioner's Foundation account in 2003. Indeed, on September 5, 2003, just before issuance of the notice of deficiency, petitioner arranged for the repayment of Vinay's student loans. [14] Given these facts, we are persuaded that distributions for student loans to petitioners' children would have continued to constitute the predominant use of the assets in petitioner's Foundation account, but for the scrutiny of the Internal Revenue Service.

The Foundation's approval of petitioner's son as a student loan beneficiary was perfunctory. The Foundation sent peti-

---

[13] For two of these distributions—$4,000 and $1,000 distributed to Shiva Vishnu Temple in 1999 and 2000, respectively—petitioners claimed charitable contribution deductions on their Federal income tax returns for those years. These deduction claims suggest that petitioners considered the funds in petitioner's Foundation account to be under his control in 1999 and 2000.

[14] On Sept. 5, 2003, petitioner directed an entity controlled by him and Vinay to pay the Foundation $70,300, the principal balance of the loans to Vinay (excluding accrued interest). Upon receipt, the Foundation waived all accrued interest and declared the loans paid in full.

tioner a distribution request form on which the approval for a student loan for Vinay had already been signed by a Foundation official before petitioner executed the form. There is no evidence that the Foundation reviewed Vinay's qualifications or otherwise exercised any independent judgment in selecting him for a student loan. In the circumstances, it is obvious that the selection of Vinay as a beneficiary of the Foundation's student loan program arose from his relationship to petitioner and as a result of petitioner's direction.

Petitioner's understanding, at the time he transferred the stocks to his Foundation account in 1998, that the account's assets could be used to make student loans to his children, and the Foundation's perfunctory acquiescence in making such loans in subsequent years, provide substantial support for the conclusion that petitioner neither intended to, nor in fact did, cede dominion and control over the property transferred to the Foundation in 1998.

Petitioners, however, point to petitioner's transfer of legal title to the stocks he contributed to the Foundation and the "Fund Advisor Statement" petitioner signed when he established the Foundation account, which stated that he "fully relinquished" ownership of the stocks to the Foundation. In petitioners' view, these formalities establish that petitioner had fully relinquished dominion and control over the property transferred to the Foundation in 1998.

We disagree. The determination of whether dominion and control has been surrendered for purposes of a charitable contribution deduction under section 170 "must be based upon all the facts of a particular case." *Pollard v. Commissioner*, T.C. Memo. 1984–536. In addition to petitioner's initial understanding of his ability to direct the use of his Foundation account funds for his children's student loans, and the Foundation's subsequent course of conduct which confirmed that understanding, we note that the Foundation did not treat the purported legal obligations in the student loan documents as binding. Although the commitment agreement required Vinay to provide an annual report, there is no evidence that he did so. More significantly, when petitioner repaid the principal amount of Vinay's student loans, the Foundation waived all accrued interest, notwithstanding the terms of the repayment agreement providing that interest was to accrue commencing on the date the agreement was

entered. [15] The Foundation having disregarded the obligations due to it from Vinay under two contracts executed in connection with Foundation account transactions, there is no reason to believe that the Foundation would enforce any rights it held against petitioner by virtue of his execution of the "Fund Advisor Statement".

A second feature of petitioner's Foundation dealings also contributes to the conclusion that he did not relinquish dominion and control over the property transferred to the Foundation. The xélan promotional materials stated that "Donors [to a Foundation account] and their family members may work for and be compensated by their family public charities [i.e., the donor's Foundation account] for good works * * * they perform on behalf of their family public charities." The materials elsewhere represented: "Anytime you want to you could take the money out of your family public charity and pay yourself compensation to do good works."

While petitioner apparently did not seek a distribution from his Foundation account to compensate him or a family member for "good works", xélan's representation to him that he would be able to do so is further evidence that the Foundation intended, and petitioner understood when he made the transfers, that he could retrieve the transferred property (or its proceeds) through this technique. A donor advised fund creator's option to receive fund assets as compensation for the performance of charitable services by himself or family members has been treated as evidence of retained dominion and control. See *New Dynamics Found. v. United States*, 70 Fed. Cl. 782, 800–801 (2006). The materials in the record describe only in very general terms the standards to be applied by the Foundation's board of directors in determining whether a donor's Foundation account funds should be paid out to him or a family member as compensation for the performance of "good works". We are satisfied on this record that "good works" distributions were contemplated by petitioner and the Foundation in 1998 as a means for petitioner to retrieve his purported contributions in the future. Consequently, we find that the possibility of such distributions supports the conclusion that petitioner

---

[15] Petitioners' own estimate of the interest that had accrued on the Foundation account loans to Vinay at the time they were repaid was $7,922.

retained dominion and control over the property purportedly contributed to the Foundation.

Petitioners contend that they did not have an impermissible degree of dominion and control over their Foundation account because it was a donor advised fund similar to the arrangements found not to have resulted in a retention of donor control in *Natl. Found., Inc. v. United States*, 13 Cl. Ct. 486 (1987). *Natl. Found.*, however, is entirely distinguishable. The Claims Court there found that while a donor advised fund creator could suggest a particular charitable use, the tax-exempt organization administering the donor's funds would honor it only if the requested contribution was "in consonance with § 501(c)(3) charitable purposes." *Id.* at 492. The court found substantial evidence that the National Foundation board of directors exercised effective control to ensure that distributions from its donor advised funds were for charitable, not personal, purposes. By contrast, petitioner requested, and the Foundation made, substantial distributions from petitioner's Foundation account for a personal use; namely, educational loans for his child. See *Fausner v. Commissioner*, 55 T.C. 620, 624 (1971) (taxpayer's payment of children's secondary school tuition is a personal, not a charitable, expenditure); *Whitaker v. Commissioner*, T.C. Memo. 1994–109 (to same effect for college tuition). Moreover, the arrangements in *Natl. Found.* did not include an option whereby the donated funds could be distributed back to the donor or his family as compensation for the performance of services deemed charitable by the foundation.

Instead, the Foundation account arrangements more closely resemble those in *New Dynamics Found. v. United States*, *supra*. In that case, the Court of Federal Claims sustained the Commissioner's denial of tax-exempt status for an organization administering purported donor advised funds. Among the features of those donor advised funds cited by the court as grounds for denial of tax-exempt status were the practices of distributing fund assets to donors' family members as compensation for the performance of charitable services or to donors' children as scholarships. Such practices, which enabled donors to direct purportedly donated funds to personal uses, contributed to the court's conclusion that "the donors in question did not truly relinquish ownership and control over the donated funds and property." *Id.* at 803.

In sum, the Foundation's representations concerning the student loan program, petitioner's understanding at the time of the 1998 transfers of his ability to direct the use of his Foundation account for the noncharitable, purely personal purpose of funding student loans for his children, and petitioner's subsequent ability to do so in practice all persuade us that petitioner never intended to, nor in fact did, relinquish dominion and control over the property transferred to the Foundation. This conclusion finds further support in the "good works" option for distribution to petitioner from the Foundation account. Accordingly, we hold that petitioner retained dominion and control over the property he transferred to the Foundation in 1998 and is therefore not entitled to a deduction under section 170(a). [16]

Respondent argues in the alternative that, even if petitioners were found to have ceded dominion and control of the property they transferred to the Foundation, their claimed charitable contribution deduction is not allowed because they did not comply with the substantiation requirements of section 170(f)(8). We agree.

Section 170(f)(8)(A) provides that no deduction shall be allowed under section 170(a) for any contribution of $250 or more unless the taxpayer substantiates the contribution with a contemporaneous written acknowledgment of the contribution by the donee organization that meets certain requirements specified in section 170(f)(8)(B). Section 170(f)(8)(B) requires that the donee organization state in the acknowledgment "Whether the donee organization provided any goods or services in consideration, in whole or part, for" the contributed property or cash. Sec. 170(f)(8)(B)(ii). If any goods or services are so provided, the acknowledgment generally must include "A description and good faith estimate of the value of any goods or services" provided. Sec. 170(f)(8)(B)(iii). [17] The

---

[16] Because we conclude that the student loan and "good works" features of petitioner's Foundation account demonstrate that he retained sufficient dominion and control over the transferred property to preclude a deduction under sec. 170(a), we find it unnecessary to consider whether other features of the Foundation account arrangements constituted impermissible retained control, including (i) the fact that petitioner was entitled to elect the investment strategy for the assets in his Foundation account; (ii) the fact that periodic distributions were made from petitioner's Foundation account to compensate the Foundation for investment management services provided to petitioner; and (iii) the fact that distributions were made from the account to pay petitioners' legal fees for their representation in the examination of their 1998 return and the prosecution of this case.

[17] If the goods or services consist solely of "intangible religious benefits", a statement to that effect must be given in lieu of the description and good faith estimate of value. Sec.

regulations clarify that a donee organization is treated as having provided goods or services in consideration for the taxpayer's payment if the taxpayer *expects* to receive goods or services in exchange for the payment at the time it is made, including where the goods or services are provided in a year other than the year when the taxpayer makes the payment.

A donee organization provides goods or services in consideration for a taxpayer's payment if, at the time the taxpayer makes the payment to the donee organization, the taxpayer receives or expects to receive goods or services in exchange for that payment. Goods or services a donee organization provides in consideration for a payment by a taxpayer include goods or services provided in a year other than the year in which the taxpayer makes the payment to the donee organization. [Sec. 1.170A–13(f)(6), Income Tax Regs.]

Respondent argues that petitioner expected when he transferred the stocks to the Foundation in 1998 that the Foundation would make student loans to his children and that consequently the Foundation provided goods or services in consideration of petitioner's transfers within the meaning of the statute and regulations.

Petitioners contend that respondent bears the burden of proof on the issue of their receipt of benefits in exchange for their contributions because it is a "new matter" within the meaning of Rule 142(a) that was not raised in the notice of deficiency and which requires the presentation of different evidence. See *Wayne Bolt & Nut Co. v. Commissioner*, 93 T.C. 500, 507 (1989). [18] Even assuming, arguendo, that respondent bears the burden of proving that petitioner expected a benefit in exchange for his transfers of the stocks to the Foundation, respondent has met that burden. [19] As our

170(f)(8)(B)(iii).

[18] The notice of deficiency issued to petitioners merely states that the deductions claimed for "charitable contributions to the xélan Foundation * * * are not allowable because they were not charitable contributions within the meaning of section 170 of the Internal Revenue Code." Because the evidence adduced so clearly establishes that petitioner anticipated receipt of benefits in exchange for his transfer of the stocks to the Foundation, respondent has satisfied any burden of proof he might bear on this issue. Thus, we find it unnecessary to decide whether respondent's contention that petitioner received a benefit rendering his substantiation inadequate under sec. 170(f)(8) "requires the presentation of different evidence * * * or merely clarifies or develops the original determination". See *Wayne Bolt & Nut Co. v. Commissioner*, 93 T.C. 500, 507 (1989); see also *Shea v. Commissioner*, 112 T.C. 183, 191 (1999).

[19] Petitioners also appear to suggest that respondent bears the burden of showing that the fair market values of the goods or services they received equaled or exceeded the values of the

Continued

findings reflect, the preponderance of the evidence shows that petitioner anticipated at the time he transferred stocks to the Foundation that the Foundation would extend student loans to his children. In addition to the abundant circumstantial evidence on this score, petitioner so testified.

"Goods or services" for purposes of section 170(f)(8) means "cash, property, services, benefits, and privileges." Sec. 1.170A–13(f)(5), Income Tax Regs. We are satisfied that the provision of student loans to family members falls within this regulatory definition. The Foundation, upon petitioner's request, provided his son a student loan with extended repayment terms and an option to substitute volunteer charity work for actual repayment of principal and interest. The outlays for petitioner's son's student loans constituted more than 80 percent of the distributions from petitioner's Foundation account (exclusive of distributions to pay the Foundation's management fees) in the first 5 years after its creation, until respondent began an examination of petitioners' 1998 return and the loans were repaid (with interest forgiven) in 2003. The evidence as a whole persuades the Court that, but for respondent's scrutiny of the 1998 return, petitioner would have continued to request and obtain student loans for all three children from his Foundation account. Thus, under the regulations, petitioner's expectation in 1998 that the Foundation would provide student loans to his children in subsequent years means that the Foundation is deemed to have provided goods or services in consideration for the donated stocks. See sec. 1.170A–13(f)(6), Income Tax Regs.

The written acknowledgment necessary under section 170(f)(8) to substantiate petitioners' charitable contribution was required to state whether goods or services were provided by the Foundation in consideration for the stocks transferred to it and if so to describe them and provide a good faith estimate of their value. See sec. 170(f)(8)(B). The Foundation acknowledgment letters offered by petitioners as substantiation of their claimed donations of stock each state,

---

stocks transferred, so that a deduction for any excess of the stocks' values over the fair market values of the consideration received is foreclosed. See sec. 1.170A–1(h), Income Tax Regs. We disagree. To establish petitioners' noncompliance with sec. 170(f)(8), respondent need only show that petitioner expected to receive a benefit in exchange for his donations to the Foundation. See *Addis v. Commissioner*, 374 F.3d 881 (9th Cir. 2004), affg. 118 T.C. 528 (2002).

inaccurately, that "No goods or services were provided for this donation." Petitioners' substantiation therefore fails to comply with section 170(f)(8).

Section 170(f)(8) provides that "No deduction shall be allowed" unless the taxpayer substantiates a contribution in accordance with the terms of that section. Where the written acknowledgment of a charitable contribution by a donee organization states that the donor received no consideration and the donor actually received a benefit in exchange for the donation, the deduction is disallowed in its entirety. *Addis v. Commissioner*, 374 F.3d 881 (9th Cir. 2004), affg. 118 T.C. 528 (2002). "The deterrence value of section 170(f)(8)'s total denial of a deduction comports with the effective administration of a self-assessment and self-reporting system." *Id.* at 887.

Petitioners contend belatedly on brief that the value of the student loan benefit provided to petitioner's son was small in relation to the value of petitioner's contribution to the Foundation[20] and that they should be entitled to a partial deduction equal to the amount by which the donated stocks' values exceeded the value of the student loan benefit, citing the "dual payment" rule of *United States v. Am. Bar Endowment*, 477 U.S. at 117, and section 1.170A–1(h), Income Tax Regs. However, having failed to satisfy a compliance provision designed to foster disclosure of "dual payment" or quid pro quo contributions, petitioners may not now claim dual payment treatment. See *Addis v. Commissioner*, *supra* at 887 ("A partial deduction is foreclosed by the statutory language.").

## *Capital Gains and Investment Income*

Respondent determined that $93,324 in long-term capital gain generated by the sales of the stocks in 1998 after petitioner transferred them to the Foundation is includible in petitioners' gross income for that year, as well as $981 of interest and dividends generated by the property in petitioner's Foundation account in 1998. We agree with respondent.

---

[20] Petitioners assert that the value of Vinay's student loan benefit is equal to the interest waived upon repayment of the loans in 2003, discounted to present value in 1998. This estimate ignores the value of the loans anticipated for petitioner's two other children and the value of the option to repay the loans with charitable services.

The Federal income tax consequences of property ownership generally depend upon beneficial ownership, rather than possession of mere legal title. *Speca v. Commissioner*, 630 F.2d 554, 556–557 (7th Cir. 1980), affg. T.C. Memo. 1979–120; *Beirne v. Commissioner*, 61 T.C. 268, 277 (1973). "'[C]ommand over property or enjoyment of its economic benefits' * * *, which is the mark of true ownership, is a question of fact to be determined from all of the attendant facts and circumstances." *Monahan v. Commissioner*, 109 T.C. 235, 240 (1997) (quoting *Hang v. Commissioner*, 95 T.C. 74, 80 (1990)). As outlined in our previous discussion of petitioners' entitlement to a charitable contribution deduction, although petitioner transferred legal title to various stocks to the Foundation in 1998, petitioner retained dominion and control over the stocks transferred. He understood that the stocks would be managed according to an investment strategy he designated, which might include their being sold and the proceeds invested differently. He understood in 1998 that he would be able to direct that the assets in his Foundation account be distributed to his children as student loans, and the Foundation complied with his direction that the account assets be applied in this manner in 2001 and 2002. The funds so applied and remaining available for that purpose included the proceeds of the sales of the transferred stocks as well as interest and dividends generated by the investment of those proceeds. Moreover, "interest earned on investment is taxable to the person who controls the principal." *P.R. Farms, Inc. v. Commissioner*, 820 F.2d 1084, 1086 (9th Cir. 1987) (citing *Helvering v. Horst*, 311 U.S. 112, 116–117 (1940)), affg. T.C. Memo. 1984–549; see also *Monahan v. Commissioner*, *supra* at 239–240. We see no reason a similar rule should not apply to dividends. Because petitioner retained dominion and control of the assets in his Foundation account, we sustain respondent's determination concerning the capital gains and interest and dividend income in 1998.

*Section 6662 Penalty*

Respondent also determined that petitioners are liable for an accuracy-related penalty for negligence, substantial understatement of income tax, or substantial valuation

misstatement. See sec. 6662(a) and (b)(1)–(3). [21] Section 6662(a) imposes a penalty equal to 20 percent of that portion of any underpayment of tax attributable to negligence or disregard of rules or regulations, sec. 6662(b)(1), or any substantial understatement of income tax, sec. 6662(b)(2). [22] Generally, no penalty shall be imposed under section 6662, however, with respect to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. Sec. 6664(c). Pursuant to section 7491(c), the Commissioner has the burden of production in any court proceeding with respect to any penalty imposed by the Internal Revenue Code. In order to meet that burden, the Commissioner must offer sufficient evidence to indicate that it is appropriate to impose the penalty. See *Higbee v. Commissioner*, 116 T.C. 438, 446 (2001). Once the Commissioner meets his burden of production, the taxpayer bears the burden of proving error in the determination to impose a penalty, including proving reasonable cause, substantial authority, or other exculpatory factors. See *id.* at 446–447.

Negligence for this purpose is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances, and it includes any failure to make a reasonable attempt to comply with the income tax laws. *Marcello v. Commissioner*, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964) and T.C. Memo. 1964–299. Disregard includes any careless, reckless, or intentional disregard. Sec. 6662(c). Negligence is strongly indicated where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction which would seem to a reasonable or prudent person to be "too good to be true" under the circumstances. *Neonatology Associates, P.A. v. Commissioner*, 299 F.3d 221, 234–235 (3d Cir. 2002), affg. 115 T.C. 43 (2000); *Pasternak v. Commissioner*, 990 F.2d 893, 903 (6th Cir. 1993), affg. *Donahue v. Commissioner*, T.C. Memo. 1991–

---

[21] Respondent did not pursue the substantial valuation misstatement penalty at trial or on brief, and we accordingly deem it abandoned. See Rule 151(e)(4) and (5); *Cluck v. Commissioner*, 105 T.C. 324, 325 n.1 (1995); *Petzoldt v. Commissioner*, 92 T.C. 661, 683 (1989).

[22] The penalties under sec. 6662(b)(1) and (2) are in the alternative and do not stack, in that the penalty does not exceed 20 percent of any portion of an underpayment even if it is attributable to both paragraphs. Sec. 1.6662–2(c), Income Tax Regs. For completeness, we consider the applicability of both.

181; *McCrary v. Commissioner*, 92 T.C. 827, 849–850 (1989); sec. 1.6662–3(b)(1)(ii), Income Tax Regs. Negligence can also include any failure to substantiate an item properly. Sec. 1.6662–3(b)(1), Income Tax Regs.

We find that petitioners were negligent because petitioner failed to make a reasonable attempt to ascertain the correctness of a deduction which would seem to a reasonable or prudent person to be "too good to be true" under the circumstances. A reasonable or prudent person would have perceived as "too good to be true" a deduction for a supposed charitable contribution where the amounts deducted could be used to fund student loans for his own children. The same is true with respect to the avoidance of capital gains taxes on the sales of stocks where the proceeds remained under petitioner's control for use by his children. To the extent petitioner ascertained the validity of the charitable contribution deduction or capital gains exclusion from xélan's employees or its printed materials, there was an obvious conflict of interest on the part of persons promoting xélan's programs. See *Rybak v. Commissioner*, 91 T.C. 524, 565 (1988). Any use of the Conner & Winters opinion letter for this purpose was also not reasonable in the circumstances. The Conner & Winters letter referred to the Foundation's student loan program as follows:

*Xélan Foundation Programs*

We are aware of several programs which the Directors of the Foundation may undertake in furtherance of the charitable activities of the Foundation. We have no reason to believe that a donor's participation in any of the following programs will cause the foundation to lose its status under Sections 501(c)(3), 509(a)(1) and 170(b)(1)(a)(iv) of the Code. *Although we have not examined documents with respect to any specific program and do not hereby render an opinion as to the tax effect with respect to any such program, we make the following general comments regarding the following possible activities of the Foundation*:

\*   \*   \*   \*   \*   \*   \*

3. *Educational Loans*

The Foundation may support an educational loan program whereby students may borrow college and graduate school tuition and related expenses for education in an area related to the Foundation's charitable purposes.[23]

---

[23] There is no evidence that the Foundation either sought, or that petitioner or Vinay provided, any information concerning how Vinay's education was in an area related to the Foundation's charitable purposes.

> Each student must agree to a loan agreement under which he or she agrees to repay the loan, with interest, or alternatively provide one year of service to a charitable organization or charitable activity for each year of tuition received. Such agreement will be enforced. There can be no private inurement with respect to such program.
> [Emphasis added.]

Thus, while the letter specifically identified the student loan program petitioner contemplated using, it expressly refrained from offering any opinion concerning the tax effects of participation in the program and confined itself merely to describing certain features of the program. If anything, the Conner & Winters letter should have put a professionally educated person such as petitioner on notice that further inquiry was warranted concerning the student loan program.

Petitioner also testified that he consulted with his accountant regarding the deduction, but there is nothing in the record concerning the nature of those discussions or, importantly, establishing that the accountant was given complete information, including petitioner's intention to direct the use of the proceeds from the contribution for student loans for his children. Without some evidence that petitioner's discussions with his accountant covered his anticipated participation in the student loan program, there is no basis to conclude that petitioner made a reasonable attempt to ascertain the correctness of the deduction. See *Patin v. Commissioner*, 88 T.C. 1086, 1130 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. without published opinion sub nom. *Hatheway v. Commissioner*, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. *Skeen v. Commissioner*, 864 F.2d 93 (9th Cir. 1989), affd. sub nom. *Gomberg v. Commissioner*, 868 F.2d 865 (6th Cir. 1989).

Finally, as our discussion of section 170(f)(8) reflects, petitioner failed to substantiate the charitable contribution as required, which is an indication of negligence.

We accordingly find that, absent their showing reasonable cause (considered *infra*), petitioners were negligent with respect to the charitable contribution deduction claimed and the capital gains and other investment income excluded in 1998 with respect to the property transferred to petitioner's Foundation account. Respondent has met his burden of production with respect to a negligence penalty for the entire underpayment.

A substantial understatement of income tax exists if the amount of tax required to be shown on the return exceeds that shown by 10 percent or by $5,000, whichever amount is greater. Sec. 6662(d)(1)(A). We have sustained respondent's determinations disallowing a charitable contribution deduction of $263,933 and requiring inclusion of capital gains income and other investment income of $93,324 and $981, respectively. The resulting deficiency, which equals the understatement, is $91,948—which exceeds 10 percent of $764,560, the amount required to be shown on petitioners' 1998 return. Respondent has therefore satisfied his burden of production regarding the existence of a substantial understatement, and petitioners bear the burden of showing any exculpatory factors.

Under section 6662(d)(2)(B), any understatement for purposes of the penalty for a substantial understatement of income tax shall be reduced by that portion of the understatement which is attributable to "the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment". Authority for this purpose may include court cases, private letter rulings, and administrative pronouncements published by the Internal Revenue Service in the Internal Revenue Bulletin. Sec. 1.6662–4(d)(3)(iii), Income Tax Regs. The weight of an authority depends on its relevance and persuasiveness and the type of document providing the authority. Sec. 1.6662–4(d)(3)(ii), Income Tax Regs.

Petitioners contend that they had substantial authority for the understatement at issue, citing the inclusion of the Foundation in Publication 78, the determination letter issued by the Internal Revenue Service to the Foundation determining that it qualified for tax exemption as an organization described in section 501(c)(3), and *Natl. Found., Inc. v. United States*, 13 Cl. Ct. 486 (1987). [24]

We disagree. The inclusion of an organization in Publication 78 "signifies that it has received a ruling or determination letter from the Service stating that contributions by donors * * * are deductible *as provided in section 170 of the Code*." Rev. Proc. 82–39, sec. 2.03, 1982–2 C.B. 759, 760 (emphasis added). The Foundation's inclusion in Publication

---

[24] Petitioners also refer to "other authorities" on brief but never name them.

78 may constitute substantial authority that the organization to which petitioners made a donation in 1998 satisfied section 170(c) (a point that respondent does not dispute), but petitioners would still be required to show that their charitable contribution deduction satisfied other requirements of section 170. The Foundation's determination letter, on which petitioners also rely, makes this point explicitly, stating: "Donors may deduct contributions to you [the Foundation] only to the extent that their contributions are gifts, with no consideration received" and citing Rev. Rul. 67–246, 1967–2 C.B. 104. Consequently, neither Publication 78 nor the Foundation's determination letter provides any authority that petitioners were entitled to deduct a contribution where they anticipated, and in fact received, consideration in exchange. *Natl. Found., Inc. v. United States*, *supra*, likewise does not constitute authority for petitioners' position. As earlier discussed, the case is readily distinguishable from petitioners' circumstances in that the court there found that the donee organization exercised effective control to ensure that distributions were for charitable purposes. By contrast, petitioner requested and the Foundation complied with substantial distributions for personal purposes. In sum, petitioners have failed to show that they had substantial authority for any portion of the understatement.

Finally, to the extent petitioners may be claiming that they had reasonable cause in view of their reliance on professional advice, see sec. 6664(c); sec. 1.6664–4(b)(1), Income Tax Regs., we find that claim meritless. The Conner & Winters opinion letter expressly disavowed any opinion concerning a Foundation donor's participation in the student loan program. As for petitioners' accountant, as noted there is no evidence that the accountant was given necessary and accurate information concerning petitioner's transactions with the Foundation to form a professional judgment. See *Neonatology Associates, P.A. v. Commissioner*, 115 T.C. at 99.

For the foregoing reasons, we sustain respondent's determination that petitioners are liable for an accuracy-related penalty under section 6662 for negligence or for substantial understatement of income tax.

*Conclusion*

Petitioners are not entitled to a charitable contribution deduction under section 170 for their transfers of appreciated stocks to the Foundation in 1998. Petitioners must include in gross income the capital gain realized when the Foundation sold the appreciated stocks in 1998 and must include the investment income generated in 1998 by the property in petitioner's Foundation account. Petitioners are liable for the accuracy-related penalty under section 6662.

We have considered all other arguments made by the parties, and to the extent not discussed, we conclude those arguments are moot, without merit, or irrelevant.

To reflect the foregoing,

*Decision will be entered under Rule 155.*