T.C. Memo. 2013-101

UNITED STATES TAX COURT

BOONE OPERATIONS CO., L.L.C., THE FAIRFAX COMPANIES, L.L.C., TAX MATTERS PARTNER, Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22850-09.                 Filed April 11, 2013.

<u>Steven William Phillips</u>, <u>Kenneth R. Moeller</u>, and <u>William M. Conway</u>, for petitioner.

<u>Anne Ward Durning</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  On July 6, 2009, respondent issued notices of final partnership administrative adjustment (FPAAs) for 2003 and 2004 pursuant to

[*2] section 6223[1] to the Fairfax Management Co., LLC,[2] the tax matters partner (TMP) of Boone Operations Co., L.L.C. (Boone), an Arizona limited liability company classified as a partnership for Federal income tax purposes. In the FPAAs respondent disallowed Boone's claimed charitable contribution deductions for 2003 and 2004. Boone, through its TMP, timely filed a petition contesting respondent's determinations. The sole issue for decision is whether Boone is entitled to charitable contribution deductions related to alleged bargain sales of fill dirt to the City of Tucson (Tucson).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts is incorporated herein by this reference. Boone's principal place of business was in Arizona at the time the petition was filed.

I.    Background

Boone owns and operates Speedway Landfill in Tucson, Arizona. Speedway Landfill accepts construction and inert debris materials from various

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]The Fairfax Management Co., LLC, is the predecessor in interest to petitioner, the Fairfax Cos., LLC.

[*3] third parties.  Speedway Landfill is to the east of, and adjacent to, the Vincent Mullins Landfill (VML).  Tucson previously operated the VML as a municipal landfill that accepted all types of domestic and commercial debris and waste.  The two landfills are surrounded by residential areas to the east and west, a park to the north, and a commercial complex to the south.

When materials in a landfill decompose, methane gas is produced.  Both the VML and Speedway Landfill produced methane gas, but the VML produced a greater quantity of methane gas because of the nature of the materials deposited.  The VML operated its own collection system and burner to mitigate the methane gas problem.  However, the flare in the VML collection system frequently was extinguished, causing significant odor problems.  Additionally, because of poor drainage, water ponds formed on the VML.  These water ponds produced more methane gas, and the subsequent runoff traveled back into the VML and the Speedway Landfill.

Douglas Kennedy, chief executive officer of Boone, received complaints from surrounding residents regarding dust and odors.  Because the two landfills were next to each other, neighbors complained about the landfills indiscriminately.  The environmental problems, particularly the odor, eventually led to a public hearing.

[*4] In 1986 the VML stopped accepting waste materials. However, Tucson subsequently encountered problems closing the VML. Fearing that the VML's closing problems and ongoing environmental problems would negatively affect Speedway Landfill, Mr. Kennedy negotiated with Tucson to resolve the various problems and to assist Tucson with the process of properly closing the VML. Accordingly, on June 17, 1996, Boone and Tucson entered into an agreement (1996 agreement) to: (1) share the costs of implementing an interim gas control system; (2) negotiate an agreement for a permanent gas control system; and (3) cooperate in extending Boone's aquifer protection permit (APP) to include the VML. The 1996 agreement also included the following provisions:

> 6. Acceptable Waste Fill and Soil Fill on * * * [the VML]. * * * [Boone] agrees to provide * * * [Tucson] with, and * * * [Tucson] agrees to accept, acceptable waste fill and soil fill as follows:
>
> 6.1. Placement of Acceptable Waste Fill. * * * [Boone] shall, at no cost to * * * [Tucson], fill the * * * [VML] with acceptable waste to the approved final grades (less cap). * * * [Boone] shall follow all requirements of the approved operations plan, including but not limited to those relating to placement of cover soil and waste screening. * * * [Boone] shall leave a surface that is sufficiently compacted and graded so that final cover can be placed directly on it. * * * [Tucson's] determination that said surface is sufficiently compacted and graded shall be final.
>
> 6.2. Removal of Unacceptable Material. If * * * [Tucson] reasonably determines that material other than acceptable waste fill has been placed on the * * * [VML], * * * [Boone] shall promptly

[*5] remove and properly dispose of the unacceptable material, and shall bear any related costs or liability associated with the unacceptable material.

During 1997 to 1999 Boone and Tucson negotiated for a modification of Speedway Landfill's APP that would extend the APP to include the VML. Between May and June 1999 Boone deposited construction debris on the VML's property in an effort to comply with the 1996 agreement.

When negotiations to modify Speedway Landfill's APP failed, Tucson notified Boone that it planned to seek a separate APP for the VML rather than continuing to seek modification of Speedway Landfill's existing APP. On September 16, 1999, Tucson wrote to Boone proposing various modifications to the 1996 agreement. Mr. Kennedy then met with the Department of Solid Waste Management (DSWM) to discuss the proposed modifications. Following the meeting, on October 15, 1999, DSWM mailed to Boone a letter identifying the critical issues relevant to obtaining a joint APP for Speedway Landfill and the VML. In the letter DSWM included the following:

Waste Encroachment. * * * [Boone] did not inform * * * [Tucson] of its intentions regarding the waste encroachment onto the VML. Under State law, * * * [Tucson] is responsible for capping and closure of the VML waste footprint. As such, * * * [Tucson] is proceeding with the VML APP, under the assumption that * * * [Boone] will remove the encroaching waste. * * * [Tucson] will be

**[*6]** contacting you, under separate letter in the near future regarding this issue.

On November 2, 1999, Blake Ashley, a principal assistant city attorney for Tucson, mailed to Mr. Kennedy a letter stating that Boone had placed a significant amount of waste on the east portion of the VML without permission and requesting that Boone, at its own cost, remove the material and apply at least two feet of clean compacted soil to the area.

On March 23, 2000, Boone filed a notice of claim against Tucson. In the notice of claim Boone requested damages of $20,566,000, allegedly attributable to waste encroachment, noncooperation, and breach of contract. From May 2000 through May 2001 Boone and Tucson attempted to negotiate a settlement of Boone's claim. During the negotiations Boone and Tucson also attempted to address and resolve neighborhood concerns, drainage issues, buffer operation, pending zoning citations, Tucson's ability to access the VML through Speedway Landfill, construction of a methane gas system and a groundwater monitoring system, abatement of the dust problem, the cost allocation attributable to the APP application process, and payment to Boone for placing 100,000 cubic yards of soil on the VML.

**[\*7]** On April 4, 2001, Tucson provided Boone with a final settlement offer. In response, Boone mailed to Tucson a letter requesting a face-to-face meeting to discuss an alternative closing plan for the VML. Subsequently, on June 8, 2001, Tucson mailed to Boone a letter: (1) informing Boone that Tucson would no longer be a party to settlement negotiations; (2) demanding that Boone remove its waste material from the VML; (3) notifying Boone that Tucson planned to sever the gas system connection between the VML and Speedway Landfill; and (4) terminating the 1996 agreement.

On September 18, 2001, the Tucson Attorney's Office filed criminal and civil charges against Boone for violations that allegedly occurred in 2000. The Tucson Attorney's Office also filed criminal trespass complaints against Mr. Kennedy and Jason Tankersley, a Boone employee.[3] Tucson filed complaints with regulatory agencies, including the Arizona Department of Environmental Quality (ADEQ) and the Occupational Safety and Health Administration.

On April 16, 2002, Boone filed a complaint against Tucson in the Superior Court of the State of Arizona, Pima County, alleging trespass, defamation, breach of contract, breach of covenant of good faith and fair dealing, trade disparagement,

---

[3]Mr. Tankersley took over Boone's operation after Mr. Kennedy's departure in 2004.

**[*8]** and breach of fiduciary duty.  Tucson filed an answer and counterclaim denying all of Boone's allegations and alleging trespass, nuisance, and breach of contract against Boone.[4]

On December 5, 2002, Tucson and Boone filed a settlement memorandum with the Superior Court for the State of Arizona, Pima County.  On April 15, 2003, Boone and Tucson entered into a settlement agreement (2003 settlement agreement).[5]  Under the 2003 settlement agreement Boone and Tucson acknowledged that disputes existed between the two parties concerning the 1996 agreement, including disputes regarding "Boone's operations on the Speedway Landfill, * * * [Tucson's] maintenance and operation of the * * * [VML], the zoning at the Speedway Landfill and other matters".  The 2003 settlement agreement provided that it resolved all known differences, disputes, disagreements, and lawsuits.

---

[4]On a date not apparent from the record, Mr. Tankersley's attorney, Dennis Rosen, filed a complaint on Mr. Tankersley's behalf alleging abuse of process by Tucson.

[5]The following parties entered into the 2003 settlement agreement:  Tucson, Boone, Fairfax Management Co., Lawyer's Title Trusts No. 7610 and No. 7714-T, Mr. Tankersley, and Mr. Kennedy.  Because most rights and obligations under the 2003 settlement agreement accrued to Boone and Tucson, we summarize the terms of the 2003 settlement agreement as they relate to those two parties.

**[*9]** Under the 2003 settlement agreement Tucson agreed to: (1) use its best efforts to gain ADEQ approval for the VML closing plan; (2) grant a right of entry and construction easement to design and construct a drainage system on the southern boundary between Speedway Landfill and the VML (southern drainage plan); (3) contribute to Boone an amount equal to $450,000 for the cost of constructing the southern drainage plan; (4) acquire any easements or rights of way needed to construct the southern drainage plan; (5) install a methane gas extraction and control system for the VML; (6) maintain and monitor the methane gas extraction system at Speedway Landfill until the VML methane gas extraction system became operational; and (7) release Boone, Mr. Tankersley, and Mr. Kennedy from any damages, actions, and causes of action arising from the ownership and operations of the Speedway Landfill. Boone agreed to: (1) move material from Speedway Landfill to the VML to satisfy the VML closing plan; (2) cooperate with Tucson in amending Tucson's existing APP, if necessary; (3) hire the Planning Center to prepare a landscape plan for Speedway Landfill, submit the landscape plan to Tucson for approval, and, once approved, implement the landscape plan; (4) refrain from placing material between Speedway Landfill and a setback line 100 feet away from the eastern boundary or within 100 feet of the southern boundary adjacent to Ashton Meadows; (5) restrict the use of vehicles

[*10] during certain hours; (6) hire an approved engineer to prepare the southern drainage plan, submit the plan to Tucson for approval, and, once approved, complete construction within 18 months; (7) move to dismiss all lawsuits pending against Tucson; and (8) release Tucson from any damages, actions, and causes of action arising from its ownership and operation of the VML. The 2003 settlement agreement also contained the following:

> 8. <u>Charitable Contribution of Acceptable Fill</u>.
>
>   8.1. <u>Prior Contribution</u>. * * * [Tucson] acknowledges that as of the date of the Settlement Memorandum, it had accepted Boone's charitable contribution of 95,000 cubic yards of Acceptable Fill which has been placed on an acceptable location on the * * * [VML] (the "Prior Contribution").
>
>   8.2. <u>Future Contribution</u>. Boone agrees to make another charitable contribution of an additional 105,000 cubic yards of Acceptable Fill which are presently stored on or near the boundary between the Speedway Landfill and the * * * [VML] (the "Future Contribution" and, together with the 2002 Contribution, the "Charitable Contribution") and to relocate the Future Contribution to locations on the * * * [VML] which are adjacent to the West 100 Feet as reasonably directed by * * * [Tucson] at Boone's cost after approval of the * * * [VML] Closure Plan as contemplated by Section 3.1, but in no event sooner than June 1, 2003. Boone agrees not to store any additional material on the West 100 Feet. Material removed from the West 100 Feet in order to obtain foundation grades as required by Section 3.1 of this Agreement shall be included as part of the Future Contribution.
>
>   8.3. <u>Value of Contributions</u>. * * * [Tucson] acknowledges and agrees that the value of the Charitable Contribution is $6.00 per cubic

[*11] yard which is the same price as it is paying for Acceptable Material pursuant to Section 9.1.  * * * [Tucson] agrees to execute such Internal Revenue Service and other forms as may be reasonably requested by Boone in order to document and establish the Charitable Contribution.

9.  Purchase of Acceptable Fill by * * * [Tucson].

    9.1.  Purchase of Acceptable Fill.  * * * [Tucson] agrees to purchase from Boone and Boone agrees to sell to * * * [Tucson], such volume of Acceptable Fill ("Purchased Material") as may be needed to satisfy the requirements of the * * * [VML] Closure Plan * * *.

    9.2.  Purchase Price.  The purchase price for the purchased Acceptable Fill shall be $6.00 per cubic yard, which shall be calculated on the basis of Pay Volume.  * * * [Tucson] shall be responsible for calculating the Pay Volume of Purchased Material.  The purchase price shall include delivery to a location within the       * * * [VML] as directed by * * * [Tucson], but Boone shall not be required to spread the material after delivery.

    9.3.  Minimum Purchase.  * * * [Tucson] agrees to purchase and pay for a minimum of 250,000 yards of Acceptable Fill.

    9.4.  Schedule for Purchases.  The parties agree that the Acceptable Fill to be provided pursuant to the Charitable Gift and the Purchased Material shall be delivered to the * * * [VML] and/or purchased by * * * [Tucson] in accordance with a schedule to be finalized within 30 days of ADEQ approval of the * * * [VML] Closure Plan contemplated by Section 3.1 of this Agreement.

*       *       *       *       *       *       *

Notwithstanding the foregoing, * * * [Tucson] agrees to purchase at least 75,000 cubic yards of Acceptable Fill from Boone within sixty (60) days after execution of this agreement by all parties, which quantity shall be applied against the minimum purchase requirement

**[*12]** of Section 9.3.  The Acceptable Fill to be provided by Boone pursuant to this paragraph shall be "clean soil".

In 2003 Boone sold 99,879 cubic yards of fill to Tucson for which Tucson paid $599,274.  In 2004 Boone sold 47,088 cubic yards of fill to Tucson for which Tucson paid $282,528.  Tucson eventually capped the VML.

II.     Federal Income Tax Reporting

Boone filed Forms 1065, U.S. Return of Partnership Income, with attached Forms 8283, Noncash Charitable Contributions, for 2003 and 2004.  On the 2003 Form 8283 Boone described the donated property as a "bargain sale of 99,879 cubic yards of fill dirt" with an appraised fair market value (FMV) of $1,048,730.  Boone attached to the Form 8283 an appraisal report prepared by Leslee Hippert from Millennium West Real Estate Advisors, LLC.  In the appraisal report Ms. Hippert indicated that the 99,879 cubic yards of delivered "non-spec" aggregate base course (ABC) had an FMV of $1,048,730.  Boone reported that it received $599,274 in the bargain sale and claimed a noncash charitable contribution deduction of $449,456.

On the 2004 Form 8283 Boone described the donated property as a "bargain sale of 47,088 cubic yards of fill dirt" with an appraised fair market value of $988,848.  Boone attached an appraisal report Ms. Hippert prepared in which she

[*13] indicated that the 47,088 cubic yards of delivered fill dirt[6] had an FMV of $988,848. Boone reported that it received $282,528 in the bargain sale and claimed a noncash charitable contribution deduction of $706,320.

## III.   FPAAs

On July 6, 2009, respondent mailed to petitioner the two FPAAs. In both FPAAs respondent determined that Boone failed to establish that the alleged bargain fill sales met the requirements for deductible charitable contributions and consequently disallowed Boone's entire claimed charitable contribution deduction.

## OPINION

## I.   Burden of Proof

Generally, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving those determinations are erroneous. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). However, the burden of proof may shift to the Commissioner pursuant to section 7491(a) if the taxpayer produces credible evidence to support the deduction or position and demonstrates that the requirements of section 7491(a)(2) have been met. See Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001). Petitioner does not contend that

---

[6]On the 2004 Form 8283 Boone refers to the donated property as fill dirt. On the attached appraisal Ms. Hippert refers to the donated property as fill soil.

[*14] section 7491(a) shifts the burden here, and the record does not establish that the requirements of section 7491(a)(2) have been satisfied.[7] Accordingly, the burden of proof remains with petitioner.

## II. Charitable Contribution Deductions

### A. In General

Section 170(a)(1) provides that a deduction is allowed for any charitable contribution, payment of which is made within the taxable year. Section 170(c)(1) defines the term "charitable contribution" to include "a contribution or gift to or for the use of * * * [a] State, a possession of the United States, or any political subdivision * * * of the foregoing, or the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes."

If a taxpayer makes a charitable contribution in property other than money, the amount of the contribution is equal to the FMV of the property at the time of contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. A contribution of property "generally cannot constitute a charitable contribution if the contributor expects a substantial benefit in return." United States v. Am. Bar Endowment, 477 U.S.

---

[7]In petitioner's pretrial memorandum petitioner acknowledged that it bears the burden of proof on all issues.

**[\*15]** 105, 116 (1986); see also Rolfs v. Commissioner, 135 T.C. 471, 480 (2010),

aff'd, 668 F.3d 888 (7th Cir. 2012); sec. 1.170A-1(h)(1), Income Tax Regs.

A taxpayer who receives goods or services in exchange for a contribution of

property still may be entitled to a charitable contribution deduction if the taxpayer:

(1) makes a contribution that exceeds the FMV of the benefit the taxpayer receives;

and (2) makes the excess payment with the intention of making a gift.[8]  Sec.

1.170A-1(h), Income Tax Regs.; see also Am. Bar Endowment, 477 U.S. at 117-

118.  If the taxpayer satisfies the above requirements, the taxpayer is entitled to a

deduction, not to exceed the FMV of the property the taxpayer transferred, less the

FMV of the goods or services the charitable organization provided.  Sec. 1.170A-

1(h)(2), Income Tax Regs.

B.    Parties' Arguments

Respondent first contends that Boone is not entitled to a charitable

contribution deduction because Boone received significant cash and noncash

consideration in exchange for the fill and petitioner has failed to prove that the value

of the fill provided to Tucson exceeded the value of the consideration Boone **]**

---

[8]This test has been applied to cases in which the payment is made in property
other than money.  See Rolfs v. Commissioner, 135 T.C. 471, 486-487 (2010),
aff'd, 668 F.3d 888 (7th Cir. 2012); see also Transam. Corp. v. United States, 902
F.2d 1540, 1543-1546 (Fed. Cir. 1990).

[*16] received. Alternatively, respondent contends that, even if petitioner proves that the value of the property donated exceeded the value of the benefit received, Boone is not entitled to any charitable contribution deductions because Boone failed to obtain contemporaneous written acknowledgments or provide qualified appraisals as required by paragraphs (8) and (11) of section 170(f). See infra part IV.[9] Respondent argues, therefore, that Boone is not entitled to any charitable contribution deductions related to the fill sales.

Petitioner contends that the FMV of the donated fill exceeded the $6 per cubic yard price Tucson paid pursuant to the 2003 settlement agreement. Petitioner primarily relies on Ms. Hippert's two valuation reports to support this contention. Petitioner also contends that because Boone intended to make a charitable contribution to Tucson at the time of the sale, Boone had the requisite charitable intent. Finally, petitioner contends that Boone complied with all substantiation requirements, including the contemporaneous written acknowledgment requirement and the qualified appraisal requirement. Petitioner

---

[9]Respondent also contends that even if Boone is entitled to a charitable contribution deduction for the fill, Boone may deduct only an amount equal to Boone's adjusted basis in the fill because the fill constituted ordinary income property. Petitioner contends that the fill is not ordinary income property because Boone did not hold the fill for sale to customers in its ordinary course of business. We need not address this argument because we find that Boone is not entitled to any charitable contribution deductions related to the alleged bargain sales of fill.

**[*17]** argues, therefore, that Boone is entitled to its claimed charitable contribution deductions for 2003 and 2004.

### C.    Substantiation Requirements

Respondent contends that Boone failed to satisfy the substantiation requirements of section 170(f).  We address these requirements below.

#### 1.    Contemporaneous Written Acknowledgment Requirement

If a taxpayer makes a charitable contribution of $250 or more, the taxpayer is not entitled to a deduction unless the taxpayer obtains a contemporaneous written acknowledgment from the donee.  Sec. 170(f)(8)(A).  Section 170(f)(8)(C) provides that a written acknowledgment is contemporaneous when the taxpayer obtains the acknowledgment on or before the earlier of:  (1) the date the taxpayer files a return for the year in which the taxpayer made the contribution; or (2) the due date, including extensions, for filing that return.  Section 170(f)(8)(B) provides that the contemporaneous written acknowledgment must include the following:

> (B)  Content of acknowledgment.--An acknowledgment meets the requirements of this subparagraph if it includes the following information:

>> (i)  The amount of cash and a description (but not value) of any property other than cash contributed.

**[*18]**        (ii)  Whether the donee organization provided any goods or services in consideration, in whole or in part, for any property described in clause (i).

(iii)  A description and good faith estimate of the value of any goods or services referred to in clause (ii) or, if such goods or services consist solely of intangible religious benefits, a statement to that effect.

A donee provides goods or services as consideration if the donor expects to receive those goods or services in exchange for the donation at the time the donation is made.  Sec. 1.170A-13(f)(6), Income Tax Regs.; see also Viralam v. Commissioner, 136 T.C. 151, 169 (2011).  Goods or services include "cash, property, services, benefits, and privileges."  Sec. 1.170A-13(f)(5), Income Tax Regs.

In Viralam v. Commissioner, 136 T.C. at 170, the donee organization provided student loans with beneficial terms in exchange for the taxpayer's donation.  The donee organization provided the taxpayer with acknowledgment letters stating that the donee provided no goods or services in exchange for the donation.  Id. at 170-171.  We held that "[w]here the written acknowledgment of a charitable contribution by a donee organization states that the donor received no consideration and the donor actually received a benefit in exchange for the donation, the deduction is disallowed in its entirety."  Id. at 171.  In so holding, we

[*19] emphasized that the substantiation requirements are designed to "foster disclosure of 'dual payment' or quid pro quo contributions". Id.

Petitioner contends that it submitted into evidence two types of documents that constitute contemporaneous written acknowledgments: (1) the 2003 settlement agreement; and (2) the Forms 8283 attached to Boone's 2003 and 2004 returns.[10]

Respondent contends that the 2003 settlement agreement does not constitute a contemporaneous written acknowledgment because the 2003 settlement agreement did not include a statement as to whether Tucson provided goods or services in consideration for the fill or a good-faith estimate of the value of any goods or services Tucson provided to Boone. Respondent also contends that the Forms 8283 do not constitute contemporaneous written acknowledgments. Respondent notes that Tucson completed only part IV of each Form 8283 and that part IV of Form 8283 does not contain a statement as to whether Tucson provided any goods or services in exchange for the fill.

---

[10]Petitioner also contends that the copy of Tucson's invoice and payment recap constitutes a contemporary written acknowledgment. However, the payment recap relates only to invoices beginning in May 2003 and extending through September 2006. Furthermore, the payment recap is dated December 8, 2010. On the basis of this evidence, we cannot conclude that this document is a contemporaneous written acknowledgment. See sec. 170(f)(8)(C).

[*20] Boone contributed property worth more than $250; therefore, Boone must satisfy the contemporaneous written acknowledgment requirement. Both the 2003 settlement agreement and the Forms 8283 satisfy the "contemporaneous" requirement of section 170(f)(8)(C). However, while the 2003 settlement agreement indicates that Tucson provided goods and services in exchange for Boone's contribution of fill, the 2003 settlement agreement lacks a good-faith estimate of the value of those goods and services. Additionally, although the 2003 settlement agreement indicates the amount of cash Tucson agreed to pay for the fill, it does not value the other benefits Boone received. See infra pp. 38-48. The Forms 8283 make no mention of any benefits Boone received beyond the $6 per cubic yard sale price. Accordingly, these documents fail to satisfy the requirements of clauses (ii) and (iii) of section 170(f)(8)(B).

Petitioner, relying on Simmons v. Commissioner, T.C. Memo. 2009-208, aff'd, 646 F.3d 6 (D.C. Cir. 2011), argues that we should apply the substantial compliance doctrine to the contemporaneous written acknowledgment requirement. However, in Simmons we did not apply the substantial compliance doctrine to decide whether the taxpayer satisfied the contemporaneous written acknowledgment requirement of section 170(f)(8); instead, we noted that the substantial compliance doctrine may apply to the qualified appraisal requirements

[*21] of section 170(f)(11). Accordingly, Simmons does not stand for the proposition for which petitioner cites it. Furthermore, "[t]he doctrine of substantial compliance does not apply to excuse compliance with the substantiation requirements of section 170(f)(8)(B)." RP Golf, LLC v. Commissioner, T.C. Memo. 2012-282, at *7; see also Hewitt v. Commissioner, 109 T.C. 258, 263-264 (1997) (noting that although the substantial compliance doctrine applied to determine whether the taxpayers complied with the requirements under section 170 to provide the Internal Revenue Service with a qualified appraisal, the taxpayers could not rely on the substantial compliance doctrine to relieve them of the requirement of obtaining a qualified appraisal), aff'd without published opinion, 166 F.3d 332 (4th Cir. 1998).

The Forms 8283 fail to show either an acknowledgment of the consideration exchanged or a good-faith estimate of the FMV of that consideration, and the 2003 settlement agreement shows only that Tucson provides some goods and services, as well as cash, in exchange for the fill. Petitioner may not rely on the substantial compliance doctrine to excuse the failure to provide a contemporaneous written acknowledgment. Accordingly, we find that petitioner failed to comply with the contemporaneous written acknowledgment requirement. See Viralam v. Commissioner, 136 T.C. at 171.

**[*22]**     2.     Qualified Appraisal Requirement

Because we find that Boone did not provide a contemporaneous written acknowledgment that satisfied the requirements of section 170(f)(8), we need not and do not decide whether Ms. Hippert's reports valuing the 2003 and 2004 fill transactions were qualified appraisals under section 170(f)(11)(E).

D.     Bargain Sale Charitable Contributions

Even if we were to find that Boone obtained a contemporaneous written acknowledgment as required by section 170(f)(8) and provided qualified appraisals under section 170(f)(11), petitioner still would not be entitled to the claimed charitable contribution deductions because petitioner failed to prove that the FMV of the fill contributed exceeded the FMV of the consideration Boone received. A taxpayer's contribution is deductible "only if and to the extent it exceeds the market value of the benefit received." Am. Bar Endowment, 477 U.S. at 117. FMV is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion and both having reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs. The taxpayer claiming a deduction must, at a minimum, demonstrate that "he purposely contributed money or property in excess of the value of any benefit he received in return." Am. Bar Endowment, 477 U.S. at 118; see also Ebben v.

[*23] Commissioner, 783 F.2d 906, 910 (9th Cir. 1986), aff'g in part, rev'g in part T.C. Memo. 1983-200; Rolfs v. Commissioner, 135 T.C. at 489. When a taxpayer enters into a contractual arrangement with another party and claims that a bargain sale occurred, we consider the entire contractual arrangement in determining whether the taxpayer contributed money or property in excess of the value of the benefits received. Thompson v. Commissioner, 21 T.C. 448, 450-451 (1954), aff'd, 222 F.2d 893 (3d Cir. 1955); Derby v. Commissioner, T.C. Memo. 2008-45.

In Derby v. Commissioner, T.C. Memo. 2008-45, slip op. at 8-16, a number of primary care physicians negotiated to sell their independent practice association to Sutter Health, a corporation that managed a regional health care system. The physicians and Sutter Health entered into three agreements: (1) a professional services agreement, whereby the physicians would become shareholder-employees of Sutter Health; (2) physician employment agreements, whereby the physicians agreed to practice medicine for Sutter Health in exchange for compensation; and (3) asset purchase agreements (APAs). Id., slip op. at 20, 24-25.

Under the APAs Sutter Health agreed to purchase all fixtures and personal property used in each physician's business. Id. at 26-27. Under article 1.04 of each APA, Sutter Health and the selling physician agreed that the purchase price was less than the fair market value price and that the difference between the two

[*24] values constituted a contribution. Id. at 27. Furthermore, the parties agreed that if a physician decided to claim a charitable contribution deduction for the difference, Sutter Health would execute a donee acknowledgment for tax purposes. Id.

The individual physicians claimed charitable contribution deductions for their allocable share of the contribution to Sutter Health under the APAs. Id. at 31-32. The Commissioner denied the deductions, and we sustained the Commissioner's determination. Id. at 58. Although the physicians attempted to separate the APAs from the other contractual agreements, we concluded that the professional services agreements and the physician employment agreements were "integral to and legally interdependent with" the APAs; therefore, the entire series of contractual agreements must be analyzed in deciding whether a bargain sale occurred. Id. at 44. Whether the professional services agreements and physician employment agreements were not designated as direct payment for the intangible assets transferred in the APAs, we concluded that, given the nature of the transaction, the physicians' "intangible assets functioned as leverage in the negotiations and that their transfer * * * resulted in an increase in the total consideration * * * [the physicians] received in the transaction." Id. at 48. We denied the claimed deductions because the physicians failed to prove that the

[*25] FMV of what they transferred exceeded the FMV of what they received. Derby v. Commissioner, slip op. at 49. Furthermore, we acknowledged that although the consideration was difficult to value, the Court could not simply disregard the consideration received "in determining whether a quid pro quo existed that defeats donative intent."[11] Id. at 54.

A quid pro quo analysis thus requires two steps. First, we must value Boone's contributed fill. See Rolfs v. Commissioner, 135 T.C. at 489. Second, we must analyze the FMV of the consideration, if any, Boone received under the 2003 settlement agreement. See id. at 488; see also Derby v. Commissioner, T.C. Memo. 2008-45.

_____

[11]We note that when a taxpayer establishes that he or she paid or incurred a deductible expense but does not establish the amount of the expense, we may estimate the amount of the deductible expense (the Cohan rule). Cohan v. Commissioner, 39 F.2d 540, 542-544 (2d Cir. 1930). For the Cohan rule to apply, the taxpayer first must establish that he or she paid or incurred a deductible expense. Under the quid pro quo analysis for bargain sales, the taxpayer must prove that the FMV of what he or she transferred exceeded the FMV of what he or she received in order to establish that he or she made the contribution with donative intent. See Derby v. Commissioner, T.C. Memo. 2008-45, slip op. at 54. Accordingly, in a bargain sale scenario, the taxpayer cannot establish that he or she incurred a deductible expense (the charitable contribution) unless the taxpayer can show that the FMV of what he or she transferred exceeded the FMV of what he or she received. Furthermore, while a taxpayer may use estimates to show that the FMV of the consideration transferred exceeded the FMV of the consideration received, the Court itself may not estimate the FMVs of such consideration exchanged unless the taxpayer introduces sufficient evidence upon which we can base such an estimate.

**[\*26]**         1.         <u>The Value of the Property Transferred</u>

                   a.         <u>Background</u>

Petitioner contends that the FMV of the fill transferred is equal to the FMV determined in Ms. Hippert's appraisal reports that Boone attached to its Forms 8283.  Respondent contends that Ms. Hippert's appraisal reports are unreliable and therefore should be disregarded.

                   b.         <u>FMV Standard</u>

For Federal tax purposes the relevant valuation standard is "fair market value", which is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."  Sec. 1.170A-1(c)(2), Income Tax Regs.; see <u>Rolfs v. Commissioner</u>, 135 T.C. at 489; <u>Browning v. Commissioner</u>, 109 T.C. 303, 314 (1997); cf. <u>United States v. Cartwright</u>, 411 U.S. 546, 551 (1973).  FMV is a question of fact to be determined from the entire record.  <u>Goldstein v. Commissioner</u>, 89 T.C. 535, 544 (1987); <u>Doherty v. Commissioner</u>, T.C. Memo. 1992-98, <u>aff'd</u>, 16 F.3d 338 (9th Cir. 1994).

The FMV of the fill is determined as of the delivery date of the alleged 2003 and 2004 contributions, on the basis of a hypothetical willing buyer and a

[*27] hypothetical willing seller. Sec. 1.170A-1(b) and (c)(1), Income Tax Regs.; see Doherty v. Commissioner, 16 F.3d at 340; Rolfs v. Commissioner, 135 T.C. at 480-481. The FMV of property reflects its highest and best use as of the date of its valuation. Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990). However, if a hypothetical buyer would not have reasonably considered a potential use of the property, we should not consider that potential use in valuing the property. Boltar, L.L.C. v. Commissioner, 136 T.C. 326, 336 (2011).

### c. Expert Testimony

Respondent did not call an expert witness. Petitioner called one witness, Ms. Hippert, to testify as an expert on the valuation of the fill. Ms. Hippert is a licensed appraiser under Arizona law with extensive experience in valuing sand and gravel materials. We recognized Ms. Hippert as an expert on the valuation of the fill. Pursuant to Rule 143(g)(1), Ms. Hippert testified on direct examination primarily through her two expert reports, the first dated September 10, 2004 (valuing the 2003 fill transaction), and the second dated April 7, 2005 (valuing the 2004 fill transaction), which the Court admitted into evidence. We may accept or reject the findings and conclusions of an expert, according to our own judgment.

[*28] See Parker v. Commissioner, 86 T.C. 547, 561-562 (1986). In addition, we may be selective in deciding what parts (if any) of an expert's opinion to accept. See id.

### d. Valuation of the Fill

#### i. 2003 Fill Transaction

Ms. Hippert prepared a summary appraisal of 99,879 cubic yards of delivered "non-spec" ABC. According to her report ABC "consists of clean, sound, durable particles of crushed stone, crushed slag, crushed gravel, crushed recycled concrete, angular sand, or other approved material". Ms. Hippert testified that government agencies typically purchase "spec" fill, meaning that the buyer specifies the composition of the dirt. Neither spec nor non-spec ABC contains clay deposits, which hinder compactability. However, if compactability is not an issue, some users of non-spec ABC may use screen fill, which does contain clay deposits.

Ms. Hippert testified that no Tucson area providers sold non-spec ABC. Ms. Hippert relied on Mr. Tankersley's statement that Boone's non-spec ABC was comparable to spec ABC, and therefore she assumed that little to no difference in price existed between spec and non-spec ABC.

[*29] Ms. Hippert determined actual market value by phoning various suppliers in the Tucson area and inquiring about the price of ABC, the price of screen fill, and delivery pricing. Most suppliers quoted a price of a ton of non-spec ABC rather than a cubic yard. Therefore, Ms. Hippert needed to determine the weight, in tons, of a cubic yard of Boone's fill. Ms. Hippert testified that to do so, she spoke with several soil engineers and determined that ABC found in Tucson has a density varying between 1.35 and 1.55 tons per cubic yard. She also testified that she spoke with a representative at Boone who told her the Boone fill would weigh about 1.49 tons per cubic yard. Ms. Hippert decided to use a conversion factor of 1.5 tons per cubic yard.

Ms. Hippert analyzed the price information she collected from suppliers. She collected information about the free on board (FOB) price as well as the delivered price of ABC and screen fill. In addition, she ascertained that some suppliers offer discounts of 10% or 30% to high-volume purchasers. Ms. Hippert determined that the undiscounted FOB price per ton for screen fill ranged from $4.50 to $5.50, with a mean of $4.70 and a median of $4.50. The non-discounted FOB price per ton for ABC ranged from $5.25 to $7.50, with a mean of $5.95 and a median of $5.50.

[*30] Because Ms. Hippert encountered a wide range of delivery prices, she also considered the amount of labor hours and equipment Boone used in delivering 99,879 cubic yards of fill. Ms. Hippert testified that Mr. Tankersley provided her with information regarding how many hours and employees were needed to provide the non-spec ABC to Tucson. Ms. Hippert testified that she could not recall whether she analyzed the documents recording the hours or whether she relied solely on Mr. Tankersley's statement.

Ms. Hippert determined that the estimated discounted price for delivered screen fill ranged from $6.39 to $8.55 per ton, averaging $7.81 per ton. The estimated discounted price for delivered spec ABC ranged from $7.44 to $10.87 per ton, averaging $8.97 per ton. Because Boone contributed non-spec ABC, Ms. Hippert concluded that the fair market value per ton would be slightly less than the low value for delivered ABC. Ms. Hippert determined that the FMV of Boone's fill would be $7 per ton, or $10.50 per cubic yard. Therefore, she valued Boone's contribution at $1,048,730 for 99,879 cubic yards.

Ms. Hippert testified that, when preparing her report, she considered only section 9 of the 2003 settlement agreement and she did not attempt to value any other part of the consideration furnished under the 2003 settlement agreement. She also testified that she believed extreme pressure existed during negotiations

[*31] and therefore the price in the 2003 settlement agreement did not reflect the FMV of the fill.

### ii. 2004 Fill Transaction

Ms. Hippert prepared a summary appraisal of 47,088 cubic yards of delivered fill that met ADEQ specifications for use as landfill cover. Ms. Hippert testified that her approach in valuing the 2004 fill transaction varied from her approach in valuing the 2003 fill dirt transaction report because Tucson planned to use the fill provided in 2004 for a different purpose; namely, as landfill cover to cap the VML. Therefore, she analyzed both the market price of ABC and the costs of Tucson's other options for capping the VML.

As in the first report, Ms. Hippert needed to convert cubic yards into tons. Using the same sources that she used to value the 2003 fill transaction, Ms. Hippert decided on a conversion factor of 1.5 tons per cubic yard. She then interviewed various ABC suppliers in the Tucson area to determine both the FOB price and the delivered price of ABC. She determined that the FOB price per ton ranged from $6 to $7.50 with a mean of $6.51 and a median of $6.50. She also determined that the delivered price per ton ranged from $9.90 to $14.50, with a mean of $12.57 and a median of $12.73.

[*32] To determine alternative options for capping the VML, Ms. Hippert spoke with David Bell, an employee of Tucson's Solid Waste Management Department (SWMD) since 1996.[12] Ms. Hippert testified that she relied on Mr. Bell's statement that Tucson's only other source for the proper fill was the Los Reales landfill several miles away. She further testified that she relied on Mr. Bell's statement that Tucson did not want to use the soil at the Los Reales landfill to cap the VML.

On the basis of her discussion with Mr. Bell and her own research, Ms. Hippert determined that Tucson had two alternatives for capping the VML. First, Tucson could purchase a geomembrane system, a type of plastic cap used by landfill operators in areas where soil is not readily available. Ms. Hippert determined that the cost of this system would be $70.88 per ton of material in the VML. Second, Ms. Hippert determined that Tucson could use soil from the Los Reales landfill. Ms. Hippert determined that the FMV of fill from the Los Reales landfill was $6.51 per ton, or $9.76 per cubic yard, FOB. Because of the transportation costs, Ms. Hippert concluded that the FMV of that fill would be at least $11.84 per ton, or $17.76 per cubic yard.

---

[12] In the early 2000s the SWMD was renamed the Environmental Services Department. For simplicity, we refer to it as the SWMD for all years.

**[*33]** Given the high price of the geomembrane system and the $11.84 per ton price of the Los Reales soil, Ms. Hippert concluded that Tucson would pay an amount on the higher end of the delivered ABC price range. She also concluded that most ABC suppliers would offer a discount of 25% to 30% for large volume purchases. Therefore, she estimated an FMV of $14 per ton, or $21 per cubic yard. Ms. Hippert valued Boone's 2004 contribution at $988,848 for 47,088 cubic yards of fill.

Ms. Hippert testified that, when preparing her report, she considered only section 9 of the 2003 settlement agreement and she did not attempt to value any other part of the consideration furnished under the 2003 settlement agreement.

### iii. Analysis

Petitioner has failed to convince us that there was any bargain sale resulting from the 2003 settlement agreement or that the property allegedly contributed was valued properly. We explain below.

While Ms. Hippert appeared to be a competent appraiser, we are convinced that she made some material mistakes in preparing her appraisals that render her opinions of value unconvincing. For example, Ms. Hippert erroneously considered delivery and labor costs in determining the FMV of the fill. Mr. Kennedy testified that the delivery and labor costs incurred in delivering the fill to

[*34] the VML would have been deducted as a business expense in the year paid. Mr. Tankersley also testified that Boone deducted on its tax returns the amounts paid to Westfall Trucking for delivering the fill to the VML. In her appraisal reports, Ms. Hippert noted that "[t]he largest component of the total cost for sand and gravel delivered to the consumer is usually the cost for transportation". Therefore, the FMV of the fill in 2003 and 2004 should have been limited to the FMV of FOB comparable material; otherwise, Boone would be able to deduct delivery and labor costs twice, once as a business expense and again as part of a charitable contribution.

Additionally, while both appraisals valued the same type of fill, Ms. Hippert conducted each appraisal differently. In valuing the 2003 fill transaction, she compared the prices of other ABC suppliers. In valuing the 2004 fill transaction, she compared the cost of obtaining material to cap the VML. Ms. Hippert explained that Tucson used the fill provided in 2004 for a purpose different from that for the fill provided in 2003. The 2003 settlement agreement distinguishes between two types of fill: (1) acceptable cover fill; and (2) acceptable fill, which includes acceptable cover fill as well as waste materials. Section 9 of the 2003 settlement agreement contemplates that Tucson would purchase acceptable fill as well as acceptable cover fill but includes a purchase price only for acceptable fill.

[*35] Despite this distinction, Tucson paid $6 per cubic yard for fill in both 2003 and 2004. Petitioner introduced no evidence that the fill delivered in 2004 differed from the fill delivered in 2003.

Furthermore, although the highest and best use of the fill may have been use as capping material, petitioner introduced no evidence that a hypothetical buyer would purchase Boone's fill for use as capping material. Therefore, Ms. Hippert erred in considering the cost of capping materials when determining the fair market value of Boone's 2004 fill contribution.

Even if Ms. Hippert properly considered the cost of capping alternatives, she formed her conclusion on the basis of two untenable assumptions: (1) that Boone's non-spec ABC was a superior material for capping the VML; and (2) that few economically reasonable alternatives existed. Ms. Hippert thus calculated an FMV of $21 per cubic yard, twice as much as the value of the same fill in the 2004 report.

Contrary to Ms. Hippert's assumptions, Mr. Bell testified that the composition of Boone's non-spec ABC did not make it a superior material for capping the VML. Mr. Bell further testified that ADEQ does not specify requirements for landfill cover soil and that ABC fill could be used as cover soil. We find this testimony to be credible. Ms. Hippert should have calculated an

**[*36]** FMV closer to the FMV of Boone's non-spec ABC, reflected in Ms. Hippert's valuation of the 2003 fill transaction.

Another example of a material mistake by Ms. Hippert involves her analysis of alternatives for capping the VML. Although Ms. Hippert considered some of Tucson's available options for capping the VML, she failed to consider one significant alternative. Mr. Bell testified that Tucson also could have capped the VML using fill dirt from Udall Park, located adjacent to the VML. Mr. Bell further testified that Tucson did not use the Udall Park fill because Tucson entered into the 2003 settlement agreement under which Boone agreed to provide fill to cap the VML.

Because Udall Park is adjacent to the VML, Tucson would have avoided the additional delivery costs inherent in obtaining soil from the Los Reales landfill. Given the proximity of Udall Park to the VML, the FMV of the soil likely would have been closer to the FOB price of the Los Reales landfill soil, or $9.76 per cubic yard. This price was within the range of the price of FOB spec-ABC. Ms. Hippert should have determined that the 2004 fill contribution had an FMV approximately equal to that of the 2003 fill contribution.

In valuing the 2003 fill transaction Ms. Hippert concluded that the FMV for undiscounted FOB screen fill ranged from $6.75 to $8.25 per cubic yard and that

[*37] the fair market value for undiscounted FOB spec-ABC ranged from $7.87 to $11.25 per cubic yard. She also noted that suppliers typically offer a discount of 10% or 30% to large volume purchasers.

Given that: (1) Tucson agreed to purchase a large volume of fill; (2) Boone's fill was non-spec ABC; and (3) we must eliminate delivery charges, we cannot conclude that Ms. Hippert correctly determined that Boone's fill had an FMV of $10.50 per cubic yard. Rather, the FMV of Boone's non-spec ABC was likely closer to the price of discounted FOB screen fill, which ranges from $4.72 to $6.75 per cubic yard.

Under the 2003 settlement agreement Tucson agreed to pay $6 per cubic yard. A price list from Speedway Landfill shows that Boone sold fill to customers at a price of $3 per cubic yard.[13] Ms. Hippert's appraisals reflect that the FMV of the fill ranged from $4.72 to $6.75 per cubic yard. Accordingly, on the basis of the evidence presented, we cannot conclude petitioner has proved that the FMV of Boone's contributed fill exceeded the value of Tucson's payment.[14]

---

[13]Mr. Kennedy testified that the $3 price was sufficient to cover the cost of the fill.

[14]Mr. Kennedy testified that he estimated that the cost to provide the fill to Tucson would be $5. He further testified that he suggested the price of $6 per cubic yard because that amount would cover the cost of providing the fill as well as his

(continued...)

**[\*38]** 2. The Value of the Benefits Received

We also must analyze whether Boone received any additional consideration. See Derby v. Commissioner, T.C. Memo. 2008-45. The fill sale was not an independent transaction but rather an integral and interdependent part of the settlement agreement. Petitioner contends that, except for Tucson's payment of $6 per cubic yard of fill, Boone received nothing of value under the 2003 settlement agreement. We disagree. Boone received additional enumerated benefits as well as unenumerated benefits under the 2003 settlement agreement. We address these benefits below.

a. Enumerated Benefits

i. Resolution of Zoning Disputes

Respondent contends that under the 2003 settlement agreement, Tucson agreed to drop its zoning complaints against Speedway Landfill. Petitioner contends that because ADEQ issued an APP to Speedway Landfill, Speedway Landfill was in compliance with Tucson zoning ordinances and consequently

---

[14](...continued)
legal fees. Mr. Bell testified that he offered the $6 value and believed the value to be reasonable on the basis of his past experiences bidding for material. Mr. Bell further testified that there was little to no negotiation over the $6 per cubic yard price. While Mr. Kennedy's testimony addressed cost without profit, Mr. Bell's testimony addressed FMV.

[*39] Boone received no financial benefit from this provision. Petitioner argues that the provision constituted an admission by Tucson that it had harassed Boone with false zoning complaints. Petitioner further contends that respondent failed to introduce evidence that Speedway Landfill changed uses in violation of Tucson's zoning regulations.

Mr. Ashley testified that Speedway Landfill was not in compliance with Tucson zoning ordinances but that Speedway Landfill had been granted a nonconforming use permit. Mr. Ashley further testified that Speedway Landfill later expanded its operations by increasing their size and by initiating new business activities. Mr. Bell testified that Speedway Landfill had violated zoning ordinances by expanding beyond its natural grade before excavation. Although petitioner contends that no zoning dispute existed, the testimony of both Mr. Ashley and Mr. Bell refutes petitioner's contention. Petitioner introduced no evidence contradicting Mr. Ashley's or Mr. Bell's testimony.

Tucson's agreement to drop pending zoning disputes provided an economic benefit to Boone because Boone no longer had to pay the costs of defending against Tucson's complaints and Boone avoided any potential sanctions, if some tribunal were to have determined that Boone was in violation of the zoning ordinances. Furthermore, the agreement relieved Boone from additional

[*40] inspections by ADEQ and Tucson related to the zoning disputes. We conclude that Tucson's agreement to drop all pending zoning complaints against Speedway Landfill was part of the consideration Boone received under the 2003 settlement agreement.

### ii. Dismissal of Lawsuits and Charges

Respondent contends that Boone received a benefit because all lawsuits and criminal charges against Boone and its officers were dismissed pursuant to the 2003 settlement agreement. Petitioner first contends that under the 2003 settlement agreement only Boone and Mr. Tankersley agreed to dismiss their lawsuits and therefore this provision had no value to Boone. Second, petitioner contends that the 2003 settlement agreement makes no mention of the criminal charges and thus it did not require dismissal of those charges. Petitioner further contends that if Tucson had continued to press criminal charges against Boone, the Tucson employees involved would have been guilty of extortion.

Under section 12 of the 2003 settlement agreement, Boone and Mr. Tankersley agreed to dismiss pending civil lawsuits against Tucson. Although Boone filed the civil lawsuits against Tucson, Tucson also filed an answer and a counterclaim against petitioner. Section 12 of the 2003 settlement agreement thus benefited petitioner in two ways: (1) the dismissal of Boone's lawsuit dismissed

[*41] Tucson's counterclaims against Boone; and (2) Boone and Mr. Tankersley were relieved of the financial burden of paying legal fees attributable to the litigation.

Furthermore, under section 13 of the 2003 settlement agreement, Boone, Mr. Tankersley, Mr. Kennedy, and Tucson agreed to release each other from "all claims, demands, causes of action, debts, liabilities, obligations, * * * costs and expenses * * * of any kind whatsoever, whether in law or in equity".  Mr. Kennedy testified that Tucson agreed to dismiss all civil and criminal charges against himself, Mr. Tankersley, and Boone as part of the 2003 settlement agreement.  Mr. Ashley also testified that Tucson dismissed all criminal trespass charges against Boone, Mr. Tankersley, and Mr. Kennedy as part of the 2003 settlement agreement.

We conclude that petitioner failed to prove that the dismissal of all civil and criminal lawsuits and the releases of all claims, demands, and causes of action did not constitute a benefit to Boone.

### iii.    Drainage Plans

Under the 2003 settlement agreement Boone and Tucson agreed to a plan and a cost sharing arrangement to solve drainage problems on the southern and northern boundaries of the landfills.  To solve the southern drainage problem,

[*42] Boone agreed to hire an engineering firm to prepare and implement the southern drainage plan. In exchange, Tucson agreed to contribute $450,000 to Boone's cost of constructing the southern drainage plan. Tucson also agreed that, if necessary, it would acquire any easements or rights of way on property not owned by Boone or Tucson to implement the drainage plan for conveying water from the two landfills to the Pantano Wash. Boone and Tucson also agreed to work together to resolve the northern drainage problem.

Petitioner contends that the southern drainage problem was due to floodwaters originating from properties southeast of Speedway Landfill and that under Arizona law Tucson, not Boone, was legally responsible for the proper disposition of the floodwaters. Petitioner reiterates this argument with respect to the northern drainage problem.

Even if Boone was not legally responsible for floodwaters running across Speedway Landfill, Boone benefited from the drainage plan provision. Accumulation of water creates problems for landfills, including contributing to the development of methane gas problems. Furthermore, Tucson issued citations to Speedway Landfill for violating city code provisions relating to diversion of runoff. Developing and implementing a joint drainage plan allowed Boone to

[*43] divert water away from Speedway Landfill without the risk of legal action by Tucson and to minimize water pooling problems.

Petitioner introduced no evidence regarding the cost of developing and implementing the southern drainage plan, which would benefit both Boone and Tucson. Without credible evidence of the cost of designing and implementing the plan, we cannot conclude that Boone received no benefit from Tucson's agreement to contribute $450,000 to assist in implementing the southern drainage plan.

We conclude that petitioner has failed to prove that Boone did not receive a benefit under this provision of the 2003 settlement agreement.

### iv. Closure of the VML

Under section 3 of the 2003 settlement agreement, Tucson agreed to submit to ADEQ a closing plan for the VML by August 1, 2003. Petitioner contends that Boone received no benefit from Tucson's agreement to properly close the VML. Instead, petitioner argues that Tucson residents were the only beneficiaries of this agreement.

While Boone received no direct financial benefit from this provision, Boone received indirect benefits from Tucson's promise to properly close the VML. As Mr. Kennedy testified, Speedway Landfill received complaints about dust and odors related to both Speedway Landfill and, to a greater extent, the VML.

[*44] Methane gas continued to be a problem for the VML even though the VML no longer accepted waste materials. Proper closure of the VML would eliminate the largest source of the dust and odors, improving the image of Speedway Landfill in the community and decreasing the number of complaints Boone received.

Furthermore, the 2003 settlement agreement set a date by which Tucson would submit a closing plan to ADEQ. This provision thus created an enforceable agreement setting the timeline for closing the VML. Boone wanted the VML properly closed, and under the 2003 settlement agreement Tucson agreed not only to properly close the VML but also to submit a closing plan by a specific date. Although Tucson residents were the primary beneficiaries of the VML closure, Boone benefited by Tucson's agreement because Boone wanted the VML closed and because the agreement set a timeline for Tucson to close the VML.

We conclude that petitioner has failed to prove that Boone did not receive a benefit under this provision of the 2003 settlement agreement.

v.    Methane Gas Control System

Under section 11 of the 2003 settlement agreement, Tucson agreed to install a new methane gas extraction and control system for the VML at its sole expense. Tucson also agreed to maintain and monitor the existing methane gas system at

[*45] Speedway Landfill until the new system became operational. Petitioner contends that Tucson's agreement to do so benefited only Tucson residents, not Boone.

As noted supra, neighbors complained to Boone about odors caused by the VML and often conflated Speedway Landfill with the VML. Tucson's agreement to install a new methane gas system would decrease the odors, thereby decreasing community complaints and improving Speedway Landfill's public image. Furthermore, section 11 created a binding promise on behalf of Tucson to monitor the existing system and develop a new system. While this benefit is difficult to value, we believe that Boone received some benefit from Tucson's agreement to monitor, maintain, and upgrade its methane gas extraction and control system.

We conclude that petitioner has failed to prove that Boone did not receive a benefit under this provision of the 2003 settlement agreement.

### b.     Unenumerated Benefits

Boone also received additional benefits not specifically enumerated in the 2003 settlement agreement. For example, under the 2003 settlement agreement Tucson agreed to purchase at least 75,000 cubic yards of fill within 60 days after execution of the agreement. Mr. Bell testified that he believed Boone wanted Tucson to purchase at least 75,000 cubic yards of fill within 60 days because

[*46] Boone needed the revenue generated by the purchase for other projects. Petitioner introduced no evidence contradicting Mr. Bell's testimony. We find that Boone received a benefit under the 2003 settlement agreement in the form of securing additional funding for its other projects.

Additionally, movement of the fill from Speedway Landfill to the VML created additional airspace on Speedway Landfill. Mr. Kennedy testified that there was a maximum height for the landfill and that moving material from the landfill would create more airspace for waste materials. However, Mr. Kennedy also testified that he believed that the additional airspace within Speedway Landfill would not provide a significant benefit to Boone because of the large expanse of available space at Speedway Landfill. In contrast, Mr. Bell testified that the removal of material from Speedway Landfill would be a benefit to Boone, and Mr. Bell further testified that Mr. Kennedy had a goal of creating additional airspace at Speedway Landfill.

The record shows that the availability of additional airspace provided some benefit to Boone even though Boone may not have used the additional airspace immediately. Respondent argues that the airspace had an FMV of $27 per cubic yard on the basis of Boone's tipping fees per ton and Ms. Hippert's conversion factor of 1.5 tons per cubic yard. Petitioner contends that respondent must

[*47] discount the dollar value of the airspace because Boone did not plan to use the additional airspace for another 40 years. After discounting respondent's value, petitioner contends that the airspace provides a de minimis, incidental benefit.

Neither party introduced expert testimony valuing the airspace, and only respondent proffered an actual estimate of the airspace value. Petitioner introduced no evidence to supports its claim that Boone will not use the additional airspace for another 40 years. On the basis of the record, we conclude that the additional airspace had some value and that the additional airspace constituted a benefit Boone received under the 2003 settlement agreement.

3. Summary

Petitioner failed to prove that the FMV of the fill Boone allegedly contributed exceeded the value of the consideration Boone received from Tucson. As evidence of the FMV of Boone's fill, petitioner introduced only Ms. Hippert's appraisal reports. Our analysis of Ms. Hippert's reports supports a conclusion that the actual FMV of Boone's fill ranged from $4.72 to $7.87 per cubic yard. Even if Boone received only the $6 per cubic yard as provided in the 2003 settlement agreement, we cannot conclude on the basis of the evidence that the value of the fill transferred exceeded the amount Boone received even before the other benefits are considered. Those benefits included resolution of zoning disputes, dismissal

[*48] of civil and criminal complaints, development of a drainage plan, closure of

the VML, development of a methane gas control system, additional airspace, and

additional revenue. Ms. Hippert did not value the additional benefits Boone

received under the 2003 settlement agreement in conducting her appraisal, and

petitioner did not prove the FMV of those benefits at trial. Furthermore, petitioner

has failed to provide any evidence to permit us to estimate the value of the

additional benefits Boone received under the 2003 settlement agreement. See

Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930).

We conclude therefore that petitioner has not met its burden of proving that

the FMV of the property transferred exceeded the FMV of the consideration Boone

received under the 2003 settlement agreement. Boone is not entitled to the claimed

charitable contribution deductions.[15]

---

[15] In addition to proving that the FMV of the property transferred exceeded the
FMV of the consideration received, a taxpayer claiming a charitable contribution
deduction also must prove that he made the excess payment with the intention of
making a gift. United States v. Am. Bar Endowment, 477 U.S. 105, 117-118
(1986); see also Rev. Rul. 67-246, 1967-2 C.B. 104, 105 (providing that the excess
payment must be "made with the intention of making a gift."). Because petitioner
failed to prove that Boone contributed property in excess of the FMV of the benefits
Boone received under the 2003 settlement agreement, we need not decide whether
Boone had the intention of making a gift.

**[*49]** III.    <u>Conclusion</u>

Petitioner failed to satisfy the contemporaneous written acknowledgment requirement of section 170(f)(8) with respect to the alleged bargain sale gifts.  In addition, petitioner failed to sustain its burden of proving by a preponderance of the evidence that the 2003 settlement agreement resulted in one or more bargain sale gifts that Boone properly deducted as charitable contributions.  Accordingly, we sustain respondent's determination disallowing the claimed charitable contribution deductions for 2003 and 2004.

We have considered all the other arguments made by the parties, and to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.